# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Domagala*, 2013 IL 113688

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALBERT DOMAGALA, Appellant. |
| | |
| Docket No. | 113688 |
| | |
| Filed | April 18, 2013 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where a defendant was convicted of murder after his rough treatment of an 84-year-old man for whom he was a caregiver and who died two weeks later in a nursing home, his postconviction petition should not have been dismissed at the second stage where it made a substantial showing of a constitutional violation by alleging trial counsel's ineffectiveness in neither investigating nor presenting a defense of gross negligence by treating medical staff as a superseding, intervening cause and where expert opinion as to that gross negligence was presented by affidavit. |
| | |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Kevin M. Sheehan, Judge, presiding. |
| | |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment reversed.<br>Cause remanded. |

Counsel on Appeal

Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Shawn M. O'Toole, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, and Karmeier concurred in the judgment and opinion.

Justice Theis took no part in the decision.

## OPINION

¶ 1    The petitioner, Albert Domagala, was convicted of first degree murder. He subsequently filed a postconviction petition in which he alleged that his trial counsel rendered ineffective assistance when he failed to conduct a diligent investigation to discover that a superseding, intervening cause, *i.e.*, gross negligence of treating medical staff, and not petitioner's conduct, caused the death of the victim. The circuit court of Cook County granted the State's motion to dismiss petitioner's petition, finding that petitioner had failed to make a substantial showing of a constitutional violation. The appellate court affirmed. 2011 IL App (1st) 092905-U. For the reasons that follow, we reverse the judgments of the lower courts and remand the cause to the circuit court for an evidentiary hearing.

¶ 2                              Background

¶ 3    The following evidence was adduced at petitioner's bench trial. Petitioner was the live-in caretaker for 84-year-old Stanley Kugler. At approximately 8 p.m. on October 6, 2003, Stanley's neighbor, Mrs. Clowers, was looking through her bedroom window into Stanley's home. She saw petitioner slap Stanley in the face at least six times with enough pressure to cause Stanley's head to "bob" back and forth and she saw petitioner put his forearm against Stanley's throat at least three times. Mrs. Clowers also saw Stanley put up his arms "like he was trying to protect himself from something." Mrs. Clowers summoned her husband. Mr. Clowers also saw petitioner slap Stanley and put his arm against Stanley's throat and Stanley's head "go back." Mrs. Clowers then telephoned Thomas Guidice, a neighbor and police officer. Guidice came to the Clowers' home and saw petitioner pressing his forearm against Stanley's throat three to four times. He also saw petitioner put his hands on Stanley's shoulders.

-2-

¶ 4    Guidice left the Clowers' and went to Stanley's home. About five minutes after Guidice rang the doorbell, petitioner opened the door. Guidice went into the home and found Stanley sitting on the toilet with his pants down, crying. Guidice could see red marks on Stanley's throat. Paramedics arrived shortly thereafter.

¶ 5    After being advised of what occurred, the paramedics performed a quick examination of Stanley. They observed no contusions on his neck and Stanley complained of no pain or tenderness upon examination. As a precaution, however, the paramedics immobilized Stanley's neck with a cervical collar and placed him on a back board. Stanley was also given oxygen, a cardiac monitor, and an IV. Stanley did not state that he was in any pain until he was immobilized, at which time he complained of pain in his lower back.

¶ 6    At the hospital, a CAT scan was done, which indicated Stanley had a cervical fracture. However, sometime thereafter an MRI was performed, which suggested only a ligament injury to the neck. The use of a cervical collar was standard medical practice for both a ligament injury and a cervical fracture.

¶ 7    Robert Kugler, Stanley's son, went to the hospital after his father was taken there. Early on the morning of October 7, Stanley asked for some water. He was still wearing the cervical collar. Robert observed his father choke on a small cup of water. Robert called for the attending doctor, who helped Stanley clear his throat. Robert had not seen his father have difficulty swallowing before that point, although Stanley had been placed on a soft diet for a period of time earlier that year.

¶ 8    The same day, Michelle Bohne, a speech pathologist, evaluated Stanley. Prior to being given anything, Stanley was coughing. Bohne's examination revealed that Stanley was able to swallow his own saliva, but had problems with drinking water and a thicker liquid. According to Bohne, when Stanley attempted to swallow the thicker liquid, he swallowed multiple times and coughed to the point of choking. It was Bohne's assessment that Stanley possibly had oral and pharyngeal dysphagia. Oral dysphagia is difficulty swallowing due to mouth dysfunction whereas pharyngeal dysphagia is difficulty swallowing due to throat problems. Bohne recommended Stanley receive nothing by mouth and ordered a video fluoroscopic evaluation be done.

¶ 9    On October 8, Bohne conducted the video fluoroscopic test, in which Stanley was X-rayed while swallowing various liquids and solids mixed with barium. Stanley was wearing the cervical collar during these tests. After conducting the tests, it was Bohne's opinion that Stanley had mild oral dysphagia and moderate to severe pharyngeal dysphagia. Bohne recommended Stanley receive nutrition by a means other than normal oral consumption and also recommended swallowing therapy.

¶ 10    Dr. Bajaj, a gastroenterologist, testified he was aware that a swallow study had been done and knew it was done while the cervical collar was still on Stanley. Dr. Bajaj maintained that performance of the study with the collar on was proper "because he [Stanley] would have needed to swallow and wear the collar both."

¶ 11    Dr. John Andina, a cardiologist and Stanley's treating physician for over 10 years, testified that Stanley suffered a heart attack and stroke in February of 2003. After this, Stanley experienced mild dysphagia, which was treated successfully. In September of 2003,

when Dr. Andina treated Stanley for gastrointestinal bleeding, there was no evidence Stanley was having trouble swallowing.

¶ 12   After Dr. Andina reviewed the radiologist reports from the video fluoroscopic test, and consulted with other treating physicians, he recommended that a percutaneous endoscopic gastrostomy (PEG) tube, or feeding tube, be inserted into Stanley's stomach. The procedure was performed in the hospital.

¶ 13   Approximately a week after being taken to the emergency room, Stanley was discharged to a nursing home with the feeding tube still in place. While in the nursing home, Stanley pulled out the feeding tube several times causing peritonitis, a systemic infection, which ultimately led to his death on October 21, 2003.

¶ 14   Dr. Aldo Fusaro, the medical examiner who performed an autopsy on Stanley, testified that he reviewed Stanley's medical records and examined his body. He found no evidence of throat or neck injury and the X-ray he took showed no spinal fracture. Dr. Fusaro opined that Stanley died as a result of infection, due to displacement of the feeding tube. Dr. Fusaro ruled that the manner of death was "accidental" in both his report of postmortem examination and on the death certificate.

¶ 15   Dr. Fusaro expressed concern about how the swallow study was done. He had an "issue" with the test being performed with the cervical collar remaining on Stanley because that could affect the study. He further believed that it would be an "appropriate deduction" to conclude that Stanley may have been able to swallow without the collar.

¶ 16   Robert testified that when he hired petitioner to be his father's live-in caretaker following Stanley's stroke, petitioner was aware of Stanley's medical conditions. Prior to being hired, Robert had advised him that his father had trouble walking, was weak, had short term memory loss, needed assistance going to the bathroom, and needed meals prepared for him. Petitioner was responsible for cutting Stanley's food into small, normal-size bites. Stanley was not on any restricted diet and was able to eat anything petitioner prepared for him.

¶ 17   Robert testified that after petitioner began caring for his father, Robert would visit the home about two to three times a week and called every day to see how his father was doing. Occasionally, Robert ate with his father. He never noticed Stanley had any problems swallowing.

¶ 18   Robert testified that, on the day of the incident, he visited his father at about 5 p.m. When Robert got to the house, his father was sitting in the TV room asleep in a chair with the television on. There was a small tray next to his father's chair with a half-eaten sandwich and a glass of juice. Robert did not notice anything unusual and his father seemed fine during the visit. Later that same evening, Robert received a call from the Clowers and, upon arriving at his father's house, he saw his father being attended to and then taken to the hospital. Petitioner was arrested at this time.

¶ 19   After petitioner was arrested and advised of his rights, he gave a handwritten statement to Assistant State's Attorney Lisa Egan. In his handwritten statement, which was published during trial, petitioner stated he was hired to be Stanley's caretaker because he was unable to take care of himself after suffering a stroke. According to petitioner, on the evening of October 6, he got frustrated and angry with Stanley for pulling bandages off his hands.

-4-

Petitioner admitted he grabbed Stanley's face hard enough to cut him and slapped Stanley "maybe twice." Petitioner further stated he tried to fix the bandages and then helped Stanley to the toilet. It was at this time the doorbell rang. Petitioner was not able to answer the door immediately because he was attending to Stanley. When he did answer the door, one of Stanley's neighbors came into the house. Petitioner further stated he worked 24 hours a day, seven days a week, and had only had one day off in the last five months. It was petitioner's belief this was the reason he lost his temper with Stanley. Petitioner did not admit to putting his forearm against Stanley's neck.

¶ 20    The defense presented no evidence other than one exhibit, a photo of Stanley's kitchen. Petitioner chose not to testify on his own behalf.

¶ 21    The trial court found petitioner guilty of murder and aggravated battery to a senior citizen. In reaching its conclusion, the court found as follows:

> "I will say when the defense argues that the acts—the actions of the defendant were not sufficient to cause the injuries that ultimately resulted in the treatment that Mr. Kugler was given that resulted in his death. That is partially true.
>
> If this were a situation where a baseball bat had been used, then it would be certainly easier to argue by the State that using of a baseball bat with sufficient force, of course, could produce injuries that one should foresee would result in great bodily harm and/or death. And so I think that the defense has a point there.
>
> But the State has a point as well and that is that the defendant, any defendant, takes the victim as you—as they come.
>
> In this case what we have and what Mr. Domagala knew was that Mr. Stanley Kugler was an elderly man. *** He was a frail man. ***
>
> He was also a man who had a lot of physical ailments beyond just being elderly. *** So there is no question that this isn't just an 84-year-old man, but he was an elderly man that was very ill.
>
> * * *
>
> And again there is some dispute about the nature of the injury in terms of whether it was a fracture or whatever that caused it. There was no question in my mind that the State has proven that the defendant Mr. Domagala caused it.
>
> The evidence is clear to me that he didn't have it before he went to the hospital. He had it after. And he was diagnosed with that after he got there.
>
> Now, was he treated properly by the hospital? I don't know. It sounds as if he was given the information that they had. They may have misdiagnosed whether or not he had a cervical fracture. *** But let's assume that he was not treated properly. Let's assume for argument's sake that he was misdiagnosed.
>
> The law in this case is equally as clear. Let's assume that the hospital was negligent. There was malpractice. It doesn't matter. That's why I believe that the law, it does cut harshly both ways. And in this case, it cuts harshly against Mr. Domagala because I don't think it's absolutely clear that the hospital and the doctors have determined that he had a cervical fracture. Because if he did, perhaps they would

have treated him differently, but I don't know. It appears to me by the testimony that they may—the treatment may had been exactly the same.

But in any event, a decision was made to put in a G-tube ultimately because he couldn't get nourishment by mouth. ***

*** But it doesn't matter [how the tube came out] because the placement of the G-tube, given the circumstances that were testified to by the doctors, perforated the transverse intestine, the colon. The leakage into the intestinal cavity ultimately resulted in *** peritonitis, and that was the cause of death of Mr. Kugler.

I think the State has proven first degree murder and has also proved aggravated battery. There will be finding of guilty."

¶ 22    Thereafter, the circuit court sentenced petitioner to 40 years' imprisonment for murder and 10 years' imprisonment for aggravated battery to a senior, to run concurrently. Petitioner's motion to reconsider sentence was denied.

¶ 23    Petitioner appealed, challenging both his conviction and sentence for murder. Petitioner contended that his conviction should be reduced to involuntary manslaughter because he acted recklessly but did not know his actions created a strong probability of death or great bodily harm. The appellate court rejected these arguments and affirmed the judgment of the circuit court.

¶ 24    On October 17, 2008, petitioner, through new counsel, filed a postconviction petition in which he alleged he was deprived of effective assistance of trial counsel.[1] Petitioner claimed that trial counsel failed to properly investigate and ultimately present expert testimony that his acts did not cause Stanley's death but, rather, the death was "attributable to a supervening act disconnected from any act of defendant." Petitioner argued "[i]f trial counsel had properly investigated this issue he would have discovered that expert testimony was available to show that [Stanley's] death was the result of gross negligence by his treating medical staff." More specifically, petitioner alleged that "[t]he independent, intervening act was the gross medical negligence of hospital personnel in inserting a feeding tube into the victim based on the objective factors known, the extremely limited testing done, and the unreliable swallow study." Petitioner maintained that "trial counsel's failure to thoroughly investigate the law and facts relative to the issue of causation and ultimately offer the testimony of an expert witness" constituted ineffective assistance.

¶ 25    Petitioner attached two affidavits to his petition. The first affidavit was from Dr. David Caldarelli, a board-certified otolaryngologist. Dr. Caldarelli reviewed various medical records of Stanley's, pertinent documents relevant to petitioner's trial, and portions of the trial testimony. Based on that, Dr. Caldarelli came to the following conclusions:

"3. [I]t is my opinion within a reasonable degree of medical certainty that the

---

[1]Petitioner also asserted that appellate counsel was ineffective for failing to challenge the trial court's conclusion that the State proved beyond a reasonable doubt that petitioner's conduct caused Stanley's death. Petitioner does not argue the issue of ineffective assistance of appellate counsel in this appeal.

conduct engaged in by Mr. Domagala as related by the trial witnesses (i.e., slapping Mr. Kugler across the face with his hands several times while Mr. Kugler was seated in a chair and repeatedly shoving his forearm into the victim's neck) was neither life threatening nor sufficient trauma to result in pharyngeal dysphagia, or Mr. Kugler's inability to swallow. This opinion is based on several factors including the absence of any radiographic evidence of pharyngeal or laryngeal swelling or associated trauma or any anatomical abnormalities which may have been secondary to blunt anterior neck trauma. Also, there is no evidence that Mr. Kugler himself complained of painful swallowing or painful speaking after the incident. Given the nature of serious swallowing difficulties the absence of any such complaint is significant.

4. There is no evidence of any neck or throat examination conducted; particularly flexible fiber optic laryngscopy to ascertain any traumatic changes in the larynx or pharynx which would result in swallowing difficulties.

5. Any inability of Mr. Kugler to swallow that may have occurred was more likely the result of pre-existing medical conditions including neurologic disorders, stroke, gastroesophageal reflux disease, or dementia.

\*\*\*

7. The swallow study done on Mr. Kugler was performed while he was wearing a cervical collar. Studies have shown that cervical bracing affects swallowing physiology in even normal healthy adults and, as such, swallow tests conducted on persons wearing cervical collars will provide unreliable results such as aspiration and skew to suggesting swallowing problems where none truly exist. For that reason, I am of the opinion that the swallow test results were unreliable and performing such testing in that manner constituted gross negligence on the part of those persons who did so.

8. It is further my opinion within a reasonable degree of medical certainty that insertion of a feeding tube ('PEG' tube) premised on such testing constituted gross negligence."

¶ 26 The second affidavit was from petitioner's trial counsel, who averred as follows:

"4. At no time during the course of my representation did I conduct investigation into whether the deceased's death was caused by the deceased's wearing of a hard cervical collar during swallow testing and the subsequent placement of a feeding tube based on such results was gross medical negligence and the cause of the victim's death.

5. That said failure to investigate was not based on any trial strategy."

¶ 27 The State moved to dismiss petitioner's postconviction petition, contending that trial counsel did investigate the cause of death and trial counsel's total representation was competent. The State also argued that Dr. Caldarelli's affidavit was insufficient to establish that petitioner was prejudiced by any of trial counsel's actions.

¶ 28 The circuit court granted the State's motion to dismiss. The circuit court found that trial counsel was aware of the law regarding superseding, intervening causes, that counsel sought

to retain an expert witness, and that he knew this was a complicated medical case. The circuit court found that it could not conclude counsel's performance was deficient. Accordingly, the circuit court held that petitioner had failed to make a substantial showing of a constitutional violation.

¶ 29 The appellate court affirmed. 2011 IL App (1st) 092905-U. The appellate court concluded that petitioner could not satisfy the prejudice prong of *Strickland*. According to the court, even if counsel had investigated gross medical negligence and presented it as a defense, the outcome of the trial would not have been different.

¶ 30                                                        Analysis

¶ 31 Petitioner contends that his postconviction petition makes a substantial showing that trial counsel rendered ineffective assistance. According to petitioner, counsel failed to conduct a diligent investigation into the law and facts and, if he had, he would have found evidence was available to show that a superseding, intervening event, *i.e.*, gross medical negligence, and not petitioner's conduct, was the cause of Stanley's death. Petitioner argues that, had the trier of fact had such evidence before it, there is a reasonable probability the outcome of his trial would have been different.

¶ 32 Under the Post-Conviction Hearing Act, individuals convicted of criminal offenses may challenge their convictions on grounds of constitutional violations. 725 ILCS 5/122-1 *et seq.* (West 2010). The Act sets forth three stages of review. First, the circuit court may dismiss postconviction petitions that are "frivolous or *** patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010). A petition may be summarily dismissed as frivolous or patently without merit only if it has no arguable basis either in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009).

¶ 33 If the circuit court does not dismiss the petition, it advances to the second stage. At the second stage, counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition. 725 ILCS 5/122-4, 122-5 (West 2010). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a "substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 34 If the petitioner makes the requisite substantial showing that his constitutional rights were violated, he is entitled to a third stage evidentiary hearing. *Id.* At such a hearing, the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. See *People v. English*, 2013 IL 112890, ¶ 23. At this stage, the circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief.

¶ 35 In this case, petitioner's postconviction petition was dismissed at the second stage of review. During the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). This does not mean, however, that evidentiary questions are to be resolved at this stage. As we stated in *People v. Coleman*, 183 Ill. 2d 366 (1998):

"At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law." *Coleman*, 183 Ill. 2d at 385.

The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or "show" a constitutional violation. In other words, the "substantial showing" of a constitutional violation that must be made at the second stage (*Edwards*, 197 Ill. 2d at 246) is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief. With this understanding we turn to petitioner's allegations of ineffective assistance of counsel.

¶ 36 Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 37 Petitioner contends that his petition sets forth sufficient allegations to meet both *Strickland* prongs. With respect to deficient performance, petitioner maintains that trial counsel failed to investigate the gross negligence of Stanley's treating medical staff. Petitioner argues that, had counsel investigated such a defense, he would have discovered an expert witness, such as Dr. Caldarelli, who could have offered testimony that Stanley's death was the result of gross medical negligence, and thus provided a viable defense for petitioner. We agree.

¶ 38 Trial counsel has a professional duty to conduct "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. This duty derives from counsel's basic function "to make the adversarial testing process work in the particular case." *Id*. at 690. The duty includes the obligation to independently investigate any possible defenses. *People v. Kokoraleis*, 159 Ill. 2d 325, 329 (1994) (duty to investigate possible defenses is a "subset" of defense counsel's overall obligations). "Lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, 'applying a heavy measure of deference to counsel's

judgments.' " *Id*. at 330 (quoting *Strickland*, 466 U.S. at 691). " 'Where the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel.' " (Emphasis omitted.) *Brown v. Sternes*, 304 F.3d 677, 692 (7th Cir. 2002) (quoting *Jones v. Page*, 76 F.3d 841 (7th Cir. 1996)).

¶ 39 Illinois courts have repeatedly held that "an intervening cause completely unrelated to the acts of the defendant" will relieve the defendant of criminal responsibility. *People v. Brackett*, 117 Ill. 2d 170, 176 (1993); see also *People v. Meyers*, 392 Ill. 355, 359 (1946) ("The law is that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant."); *Cunningham v. People*, 195 Ill. 550, 572-73 (1902). Gross negligence or intentional medical maltreatment is considered an intervening cause and constitutes a valid defense to homicide. *People v. Mars*, 2012 IL App (2d) 110695, ¶ 17; *People v. Robinson*, 199 Ill. App. 3d 494, 503 (1990); *People v. Gulliford*, 86 Ill. App. 3d 237 (1980). See Carolyn Kelly MacWilliam, *Homicide: Liability Where Death Immediately Results From Treatment or Mistreatment of injury inflicted by defendant*, 50 A.L.R.5th 467 (1997) (noting many jurisdictions recognize a defense to homicide when medical treatment is grossly negligent; collecting cases); 40 C.J.S. *Homicide* § 10 (2006) (gross negligence is an intervening cause and constitutes a defense in those cases where, but for gross negligence, death would not have occurred); 40 C.J.S. *Homicide* § 11 (2006) ("one who has inflicted an injury which would not otherwise have been fatal is not responsible for a death occurring as a result of gross negligence or manifestly improper treatment," citing cases from various jurisdictions). See also 1 Charles E. Torcia, Wharton's Criminal Law § 26 (15th ed. 1993).

¶ 40 Here, Dr. Caldarelli opined that, within a reasonable degree of medical certainty, the swallow tests were unreliable and that inserting the feeding tube based on the results of those tests constituted gross negligence. Taking these averments as true, as we must at this stage of the proceedings, a viable defense has been articulated which could have been raised at trial. Given the facts of this case, an objectively reasonable attorney would have investigated and pursued such a defense. This did not happen in the case at bar.

¶ 41 The State contends, however, that petitioner failed to set forth sufficient allegations to establish deficient performance. According to the State, counsel essentially did argue gross negligence at trial and the theory was rejected. This is incorrect. Counsel did not investigate, argue, or set forth a gross negligence defense. In fact, during closing argument, counsel expressly disavowed raising any contention regarding gross medical negligence, stating:

> "[T]he law in Illinois is there [*sic*] where person inflicts a dangerous wound, it's calculated to endanger or destroy life, you can't exonerate yourself by claiming there was unskilled or improper medical treatment unless it's gross medical negligence, and we're not saying there was gross medical negligence here."

Moreover, the circuit court appeared to misapprehend the law, stating that "[i]t doesn't matter" whether there was gross medical negligence in this case.

¶ 42 Taking the allegations of petitioner's postconviction petition as true, as we must, we find

that petitioner has set forth a viable defense to murder which was not presented at trial. Accordingly, we hold petitioner has made a substantial showing that counsel rendered deficient performance.

¶ 43    To establish prejudice under *Strickland*, petitioner must show there is a reasonable probability that, had a defense of gross negligence been investigated and presented, the outcome of his trial would have been different. The appellate court concluded that such a showing could not be made in this case because Dr. Caldarelli's proposed testimony would merely be cumulative to the testimony offered by Dr. Fusaro at trial. We disagree.

¶ 44    While Dr. Fusaro did express concern about the swallow studies and their reliability, he only testified he had an "issue" with them being performed in the manner they were. This is quite different than stating that the testing procedure and insertion of a feeding tube based on that testing was gross medical negligence. Thus, Dr. Caldarelli's testimony would not be cumulative.

¶ 45    The State maintains, however, that Dr. Bajaj testified the swallow tests were properly done and that they had to be done with the cervical collar on. Thus, according to the State, Dr. Caldarelli's testimony was contradictory to Dr. Bajaj's and, therefore, petitioner was not entitled to relief. Again, we disagree.

¶ 46    Whether or not Dr. Caldarelli's opinion is contradicted by testimony given at trial is a matter of resolving evidentiary conflicts, which is inappropriate at this stage of the proceedings. Such conflicts are only appropriately resolved at the third stage, where the circuit court can weigh credibility and determine the weight to be given testimony and evidence. As petitioner points out, Dr. Caldarelli is an expert in specific fields associated with the ear, nose and throat. Based on that expertise compared to the fields Drs. Andina and Bajaj occupy, a trier of fact could determine Dr. Caldarelli's opinion is entitled to more credence and weight than either Dr. Andina or Bajaj's. If this were the case, a viable defense would be proven and there is a reasonable probability the outcome of petitioner's trial would have been different.

¶ 47    Accordingly, we conclude that petitioner's postconviction petition sets forth a substantial showing of a constitutional violation and, therefore, petitioner is entitled to an evidentiary hearing.

¶ 48                                    Conclusion

¶ 49    For the foregoing reasons, we reverse the judgments of the appellate court and the circuit court. The cause is remanded to the circuit court for an evidentiary hearing.

¶ 50    Appellate court judgment reversed.

¶ 51    Circuit court judgment reversed.

¶ 52    Cause remanded.