2020 IL App (1st) 160030-UB
No. 1-16-0030
Order filed September 30, 2020

FOURTH DIVISION

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23.

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 00 CR 11338 |
| DANIEL RODRIGUEZ, | ) ) | The Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1        *Held*: Where the over-40 year sentence of a 15-year-old defendant constitutes a *de facto* life sentence in violation of the eighth amendment,

*People v. Buffer*, 2019 IL 122327, and *Miller v. Alabama*, 567 U.S. 460 (2012), we remand for resentencing.

¶ 2          Defendant Daniel Rodriguez appeals from the second-stage dismissal of two of his claims in his petition for postconviction relief. A third claim in his petition proceeded to a third-stage evidentiary hearing. However, defendant does not appeal the dismissal of the third claim. Thus, procedurally, we are reviewing a second-stage dismissal.

¶ 3          Defendant, who was 15 years old at the time of the offense, was tried as an adult and convicted by a jury of first degree murder in connection with the drive-by shooting of 18-year-old Ricardo Vasquez on April 1, 2000. Additionally, the jury found that defendant personally discharged the firearm that proximately caused Vasquez's death. On December 28, 2006, defendant was sentenced to 45 years with the Illinois Department of Corrections (IDOC), which was the mandatory minimum sentence he could have received and which included a 25-year enhancement for personally discharging the firearm.

¶ 4          At the 2006 sentencing in this case, the trial court observed that defendant's 45-year sentence in the case at bar was required to run consecutively to a prior sentence. On June 9, 2005, defendant had been sentenced in an unrelated case to 20 years for attempted first degree murder.

Defendant claims that, as a result, he will not be released until he is 83 years old.[1]

¶ 5        On this appeal, defendant makes two claims: (1) that he made a substantial showing of ineffective assistance of trial counsel because counsel failed to investigate an alibi witness and failed to call her to testify that defendant was at a gang meeting with her at the time of the shooting; and (2) that his case should be remanded for resentencing because the sentencing scheme requires a mandatory *de facto* life in prison for a juvenile offender and thereby violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois constitution..

¶ 6        On September 28, 2018, this court issued an opinion in which we did not find the first claim persuasive, but we did remand for resentencing. On March 25, 2020, the supreme court directed us to vacate our prior judgment and "to consider the effect of this Court's opinion in *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460

---

[1]The State did not dispute this fact in its brief to this court. However, during oral argument before this court on August 9, 2018, the State asserted, for the first time, that defendant will be released at age 77. Oral argument is not the place to raise arguments for the first time. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) ("Points not argued are waived and shall not be raised in *** oral argument ***."). However, as we discuss in greater detail below, whether defendant's release will be at age 83 or 77 does not alter the substance of our analysis.

(2012), and determine if a different result is warranted." *People v. Rodriguez*, No. 124174 (Ill. Mar. 25, 2020) (supervisory order).

¶ 7    Having reconsidered, we continue to find that resentencing is warranted, for the reasons explained below.

¶ 8                                BACKGROUND

¶ 9    In sum, the State's evidence at trial established that the murder of 18-year-old Vasquez was the result of a gang-related, drive-by shooting on April 1, 2000, at 9:20 p.m. on South Escanaba Street in Chicago. Defendant was stopped by police a mile from the crime scene, only two hours later, in a vehicle that matched the description provided by eyewitnesses of the shooter's vehicle. At a show-up identification held on the street shortly after defendant was stopped, two eyewitnesses identified defendant as the shooter. Another eyewitness, although unable to identify the shooter, was able to identify defendant's vehicle as the shooter's vehicle. The parties stipulated that a gunshot residue test performed, shortly after the stop, on defendant's hands was positive for the presence of gunshot residue. In addition, another witness testified that defendant told him that defendant was seeking a gun because another gang had damaged his vehicle.

¶ 10    This court already described in detail the evidence at trial when we reviewed this case on appeal. See *People v. Rodriguez*, 387 Ill. App. 3d 812

(2008). As a result, we will not repeat that level of detail here, and we incorporate our prior opinion by reference. We set forth below a description of the evidence at trial sufficient to understand the issues on this appeal.

¶ 11    At the trial, Carlos Luna testified that he was 25 years old and that, in 2000 when the shooting occurred, he was a member of the Latin Dragons gang. On April 1, 2000, the night of the shooting, he was standing with a group of friends, including six gang members, in front of a house on South Escanaba Avenue, when he observed a four-door grey Cadillac Sevilla approaching slowly with a driver and passenger. Luna approached the vehicle and was 15 feet away from it when the driver leaned back and the passenger in the front seat opened fire, striking Vasquez. Later that night, when Luna viewed a photo array at the police station, he was not able to identify either the driver or passenger of the vehicle.

¶ 12    Camelia Prado testified that she was 29 years old and that, in 2000, she was also a member of the Latin Dragons gang. She was on the porch of the house on South Escanaba Avenue, when she observed a Cadillac approaching slowly, with the driver's window down. The driver leaned back, and the passenger in the front seat started shooting, striking Vasquez. Prado called the police, and when they arrived, she provided a description of the vehicle. An hour later, Prado, Antoine Lacy and Joseph Gonzalez went to view defendant's

vehicle, which she identified as the shooter's vehicle. However, she could not identify the shooter.

¶ 13    Joseph Gonzalez testified that he had been convicted of possession of a handgun and that, in 2000, he was a member of the Latin Dragons. On April 1, 2000, at 9:20 p.m., he was on the steps in front of a house on South Escanaba Avenue, when he observed a "short-body," four-door vehicle approach slowly, with a driver and one passenger. The driver leaned back, and the passenger in the front seat, whom Gonzalez identified as defendant, fired shots, hitting Vasquez. After the police arrived, Gonzalez provided a description of both the shooter and the vehicle. Another 10 or 20 minutes later, the police asked him to travel to another location where he identified both the shooter and his vehicle. At the time of the identification, Gonzalez was sitting in the back seat of a vehicle with Prado and another individual, while the police shined a light on the suspect. On cross-examination, Gonzalez admitted that he had lied when he testified in front of the grand jury that he was not a member of a gang.

¶ 14    Antoine Lacy testified that he was currently incarcerated due to felony convictions for aggravated assault and weapons possession and that, in April 2000, he was 17 or 18 years old and a member of the Latin Dragons. Lacy testified that, in 2000, the rivals of the Latin Dragons were the Latin Kings. On April 1, 2000, he was with a group of his friends, including the victim,

Vasquez, whom Lacy described as "[o]ne of my gang-affiliated friends." At 9:20 p.m., Lacy was standing on the sidewalk, when he observed a Buick or Cadillac approaching slowly. Lacy was 12 to 13 feet away from the vehicle when he looked into the vehicle and recognized the passenger because he had "seen him in the mall before." The passenger, whom Lacy identified as defendant, started firing through the driver's-side window as the driver leaned back. Later the police informed him "that they had caught the shooter," and he traveled with Prado and Gonzalez to a location where Lacy identified the vehicle as the shooter's vehicle and defendant as the shooter. During the identification process, the police placed defendant in front of their vehicle and focused their high beams on him.

¶ 15     Officer Edward Maras of the Chicago police department testified that on April 1, 2000, at 10:20 p.m., he was approximately a mile from the shooting when he observed defendant alone in a vehicle that matched the description of the shooter's vehicle. After Officer Maras stopped defendant's vehicle, he asked other officers to bring the witnesses to his location, and they subsequently conducted a show-up identification.

¶ 16     Prior to the testimony of Francisco Ortiz, defense counsel moved *in limine* to bar the State from asking Ortiz whether defendant was a member of the Latin Kings, which Lacy had already testified were the rivals of the Latin

7

Dragons at the time of the shooting. The trial court ruled that, if the defense "open[ed] the door," then the trial court would permit the State to ask about defendant's gang affiliation.

¶ 17 When moving to bar defendant's gang membership, defense counsel argued:

"Although it's not the next witness, the next witness after that is going to be a young man by the name of Francisco Ortiz ***. One of the things I believe he may testify to is that [defendant] is a member of the Latin Kings. I would ask as an *in limine* motion that Mr. Ortiz not be able to indicate that [defendant] is a member of the Latin Kings."

¶ 18 The State responded:

"We believe that it is relevant as the statement that [defendant] makes to Mr. Ortiz is that he was upset, blasting a rival gang for damaging his car; therefore, he wanted to take some sort of action against the rival gang and that he was speaking to a fellow gang member and asking him for a gun."

¶ 19 After listening to the attorneys for both sides, the trial court ruled:

"I really don't see any reason why you have to say that the defendant belongs to a gang. If there's anything, however, [defense counsel], on cross at all why [defendant] asked Mr. Ortiz for the gun, I'm going to let

them know because they are gang members because you are putting something into the case."

¶ 20     The trial court further explained:

"[Defense counsel], if you elicit Mr. Ortiz is in a gang, I'm going to let the State elicit that—if [defense counsel] crosses Mr. Ortiz about him being in a gang or a gang member, then, of course, I'm going to allow the State to bring out the fact that the defendant is in a gang. That shows why he asked for something. If you open the door at all, I will let it in because it's absolutely completely proper."

The trial court emphasized to defense counsel: "If you open it, the State can step right in." The prosecutor then represented to the trial court that he had instructed Ortiz "not to mention he's in a gang and the defendant is in a gang."

¶ 21     Francisco Ortiz testified that he was currently incarcerated on four felony convictions and that, in April 2000, he was 15 years old and had known defendant for a year. On April 1, 2000, at 10 a.m. or noon, defendant visited Ortiz at Ortiz's home and asked if Ortiz had a gun. Defendant stated that he wanted a gun because "he wanted to take care of some business." Defendant explained that some Latin Dragons had hit his vehicle the night before and dented the passenger side. Ortiz specifically testified that he did not give

defendant a gun. Ortiz also testified that defendant drove a Buick or Cadillac and identified photos of both defendant and defendant's vehicle.

¶ 22    The jury heard several stipulations, including a stipulation that a gunshot residue kit was administered to defendant's hands on April 1, 2000, at 11:40 p.m., approximately two hours after the shooting, and that a proper chain of custody was maintained of the kit at all times. The parties also stipulated that, after defendant was released on bond on June 4, 2001, for this case, he failed to appear and he was not apprehended until almost three years later, on February 19, 2004.

¶ 23    Scott Rochowicz, a forensic scientist with the Illinois State Police, testified that he examined the gunshot residue recovered from defendant's hands on April 1, 2000, and that, in his opinion, to a reasonable degree of scientific certainty, the level of residue found on defendant's hands was "consistent with" defendant's "discharging a firearm, handling a firearm or being in close proximity to a firearm when it was discharged."

¶ 24    Adrienne Segovia, a deputy medical examiner with Cook County, testified that the victim, Vasquez, died from a bullet that pierced his arm, lungs, and heart.

¶ 25        On September 21, 2005, the jury found defendant guilty of both first degree murder and of having personally discharged the firearm that proximately caused Vasquez's death.

¶ 26        On November 1, 2005, defendant filed two posttrial motions for a new trial and included an affidavit from Francisco Ortiz recanting his trial testimony. Ortiz had testified at trial that defendant requested a gun. The trial court conducted a posttrial hearing at which Ortiz testified. The trial court found Ortiz to be a "liar" and denied the motions.

¶ 27        On December 28, 2006, the trial court sentenced defendant to the minimum, which was 45 years with IDOC. The 45-year sentence included a 25-year enhancement for personally discharging the firearm proximately causing Vasquez's death, and it ran consecutively to a prior 20-year sentence for an unrelated attempted first degree murder conviction.

¶ 28        Defendant appealed, challenging the use of an Illinois pattern jury instruction and claiming that trial counsel was ineffective for failing to move to suppress the show-up identifications conducted immediately after defendant was stopped. This court did not find these claims persuasive and affirmed. *Rodriguez*, 387 Ill. App. 3d at 833.

¶ 29        On November 4, 2009, defendant filed a *pro se* postconviction petition with numerous claims. The petition advanced to the second stage of

postconviction proceedings, where defendant received counsel. Defendant's counsel filed a supplemental petition asserting three claims: (1) that trial counsel was ineffective for failing to investigate Lucy Avila, an alibi witness, who would have testified that defendant was with her at a gang meeting at the time of the shooting; (2) that, because defendant was 15 years old at the time of the offense, his *de facto* life imprisonment was unconstitutional; and (3) that an affidavit from Lacy was newly discovered evidence showing that Lacy had falsely identified defendant as the shooter. The supplemental petition was supported by affidavits from both (1) Avila, the proposed alibi witness, and (2) Lacy, the recanting trial witness.

¶ 30    The trial court dismissed defendant's (1) ineffectiveness claim and (2) sentencing claim at the second stage. It is the dismissal of these two claims that defendant now contests on this appeal. With respect to the ineffectiveness claim, the trial court found that it was a matter of trial strategy whether to avoid presenting evidence of defendant's gang membership.

¶ 31    In his *pro se* petition, defendant averred, under penalties of perjury, that he had discussed with his trial counsel whether to call Avila as an alibi witness and his counsel had responded: " 'I didn't think it was a good idea to present some young, Latina, female who would put you at a junta with some Latin

Kings as an alibi defense. It would definitely get you convicted.' " Defendant stated that he agreed "because he thought trial counsel knew best."

¶ 32     Specifically, in his *pro se* petition, defendant averred:

"During the time span in which [defendant] was incarcerated in Cook County Jail, trial counsel visited him briefly on two occasions: on 2/29/04 and 10/3/05. During these visits [defendant] discussed the fact that a person by the name of Lucy Avila had contacted one of his friends and told him that she was on 99th and Ewing when the murder occurred and that [defendant] was present also. Avila also informed [defendant's] friend that she wanted to testify and wanted to be a witness for [defendant]. ***

[Defendant] not knowing this witness, informed trial counsel that Avila wanted to be contacted by her phone [number] or by sending someone to her residence.

The day trial commenced the trial court asked trial counsel if he was presenting an alibi defense. Trial counsel asked for a moment to speak with [defendant]. During this brief discussion [defendant] asked trial counsel about Avila. Trial counsel responded by saying, 'I didn't think it was a good idea to present some young, Latina, female who would put

you at a junta with some Latin Kings as an alibi defense. It would definitely get you convicted.'

Afterwards, [defendant] told [the] trial court that he did not have an alibi witness for [the] defense because he thought trial counsel knew best."

¶ 33    Defendant attached to his *pro se* petition an affidavit from Avila, stating in full:

"I, Lucy Avila, being first duly sworn state on [*sic*] oath, that if called to testify in the matter of People v. Rodriguez, No. 00-CR-11338, I would testify as follows:

1. That on the night of April 1, 2000, I was on 99th & Ewing [S]t., at the hours of 9:00 p.m.—10:30 p.m.[2]

2. During this time on this date I did not know [defendant] and had seen him for the first time ever on this date.

3. During the entire time I was on 99th & Ewing [S]t. I observed [defendant] present so he could not of [*sic*] committed the murder in the above case.

---

[2] Officer Maras testified at trial that he arrested defendant at a different location at 10:20 p.m.

4. I did give [defendant's] friend my phone [number] and address to have his lawyer contact me and discuss [defendant's] alibi.

5. [Defendant's] friend did tell me that he gave my information to [defendant]. And that [defendant] said his Lawyer would contact me soon.

6. I was never contacted by [defendant's] lawyer or anyone else on behalf of [defendant's] legal representation. Further affiant sayeth not."

¶ 34 The supplemental postconviction petition filed by counsel observed that Avila's affidavit was already attached to defendant's *pro se* petition, and the supplemental petition also attached an affidavit from defendant verifying the allegations in his *pro se* petition as true.

¶ 35 At the second-stage hearing, the following colloquy occurred concerning Avila and her proposed alibi:

"DEFENSE COUNSEL: As far as we're concerned, Judge, [defendant]'s allegations on Page 20 that he told the attorney about Avila, and Avila's affidavit that she was never contacted, so there was a potential alibi witness that was never really considered.

THE COURT: [Counsel], you agree or do you agree that had she been contacted, she would have said that [defendant] was at the junta, that he was at a gang meeting[?]

DEFENSE COUNSEL: Yes, Judge."

¶ 36       After listening to counsel's arguments at the second-stage hearing, the trial court observed, in part, with respect to Avila:

> "The record makes it clear that it was clear to the trial attorney that this was an issue, that there was strategy involved here regarding whether it was beneficial to point out to a jury that [defendant] was with gang members, and therefore, could present people who were at the junta."

The trial court further observed that, even if trial counsel did not contact Avila, this did not

> "change the nature of the defense that she would have presented, the nature of the alibi, which it was clear to me from the record, it is established by the record was a decision that was made as part of a strategy by [trial counsel], and it was signed onto by [defendant]."

¶ 37       After dismissing the claims at issue here at the second stage, the trial court held a third-stage evidentiary hearing on the sole remaining claim. The third claim was that Lacy's recantation affidavit was newly discovered evidence that would probably change the result at a retrial. At trial, Lacy had identified defendant as the shooter. At the evidentiary hearing, Lacy testified that he had not observed the shooter. On October 27, 2015, the trial court denied this claim, and this claim is not at issue on this appeal.

¶ 38     On November 18, 2015, defendant filed a notice of appeal, and this timely appeal followed.

¶ 39                                    ANALYSIS

¶ 40     Defendant appeals the second-stage dismissal of the following two postconviction claims. First, he claims that he made a substantial showing of ineffective assistance of trial counsel where trial counsel failed to investigate an alibi witness and failed to call her to testify that defendant was at a gang meeting with the witness at the time of the shooting. Second, defendant claims that his case should be remanded for resentencing because a sentencing scheme that imposes mandatory *de facto* life in prison on a juvenile offender violates the eighth amendment and the proportionate penalties clause. For the following reasons, we are not persuaded by his first claim, but we remand for resentencing.

¶ 41                        I. Stages of a Postconviction Petition

¶ 42     Under the Post-Conviction Hearing Act (Act), individuals convicted of a criminal offense may challenge their convictions if there was a violation of their constitutional rights. See 725 ILCS 5/122-1 *et seq.* (West 2016); see also *People v. Domagala*, 2013 IL 113688, ¶ 32. The Act provides for three stages of review by the trial court. At the first stage, the trial court may summarily

dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2016); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 43     If the trial court does not dismiss a petition at the first stage, the petition advances to the second stage, where counsel is appointed if a defendant is indigent. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-4, 122-5 (West 2016); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine whether the petition and any accompanying documents make a "substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 44     If the defendant makes this showing at the second stage, then the petition advances to a third-stage evidentiary hearing. At a third-stage evidentiary hearing, the trial court acts as factfinder, determining witness credibility and the weight to be given to particular testimony and evidence. The court resolves any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 45                             II. Standard of Review

¶ 46     In this appeal, the trial court dismissed defendant's postconviction claims at issue during the second stage. During a second-stage dismissal hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35.

¶ 47    At this stage, the trial court accepts as true all well-pled facts that are not positively rebutted by the record. *Domagala*, 2013 IL 113688, ¶ 35 (citing *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)). There is no fact finding or credibility determination at this stage. *Domagala*, 2013 IL 113688, ¶ 35 (citing *Coleman*, 183 Ill. 2d at 385). As a result, the State's motion to dismiss raises solely the issue of whether the petition is sufficient as a matter of law. *Domagala*, 2013 IL 113688, ¶ 35 (citing *Coleman*, 183 Ill. 2d at 385). The question before the court is whether the petition's well-pled allegations, "*if proven* at an evidentiary hearing," would entitle the defendant to relief. (Emphasis in original.) *Domagala*, 2013 IL 113688, ¶ 35. Since this is a purely legal question, our review at the second stage is *de novo*. *Coleman*, 183 Ill. 2d at 387-89. *De novo* consideration in the case at bar means that we perform the same analysis that the trial judge would have performed, if we had been sitting during the second-stage dismissal hearing. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 48                    III. *Strickland* and Ineffectiveness of Counsel

¶ 49    Defendant's first claim is that his counsel was ineffective.

¶ 50    Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States

Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)). To prevail on a claim of ineffective assistance, a defendant must show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 51        To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. Counsel's performance "must be evaluated based on the entire record." *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 114.

¶ 52        To establish the second prong, that this deficient performance led to prejudice, the defendant must show that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another

way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Thus, to satisfy the second prong of *Strickland*, at a second-stage postconviction proceeding, a defendant must make only a substantial showing of a reasonable probability. See *Domagala*, 2013 IL 113688, ¶ 35.

¶ 53    Although the *Strickland* test is a two-prong test, our analysis may proceed in any order. Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a trial court may dismiss the claim if either prong is missing. *People v. Peterson*, 2017 IL 120331, ¶ 79; *People v. Cherry*, 2016 IL 118728, ¶ 24; *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dismiss on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476 (2003); *Albanese*, 104 Ill. 2d at 527.

¶ 54                       IV. Trial Strategy and *Strickland*

¶ 55    In the case at bar, defendant claims that his trial counsel's performance was "objectively unreasonable under prevailing professional norms" for both failing to investigate and failing to call a particular alibi witness at trial. See *Domagala*, 2013 IL 113688, ¶ 36.

¶ 56    "A defense counsel has a professional duty to conduct a reasonable investigation or make a reasonable decision that a particular investigation is not necessary." *People v. Robinson*, 2017 IL App (1st) 161595, ¶ 99; *Domagala*, 2013 IL 113688, ¶ 38. However, any lack of investigation is judged against a standard of reasonableness, given "all the circumstances" and "applying a heavy measure of deference to counsel's judgments." (Internal quotation marks omitted.) *People v. Guest*, 166 Ill. 2d 381, 400 (1995).

¶ 57    In addition, "the decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant." *Peterson*, 2017 IL 120331, ¶ 80. As a result, "such decisions will not ordinarily support a claim of ineffective assistance of counsel." *Peterson*, 2017 IL 120331, ¶ 80. Even "a mistake in trial strategy" will not, by itself, render representation constitutionally defective. *Peterson*, 2017 IL 120331, ¶ 80.

¶ 58    In the case at bar, defendant concedes that his proposed alibi witness, Avila, would have placed him at a gang meeting at the time of the shooting. At the second-stage dismissal hearing, the trial court specifically inquired about this point, and the defense conceded it:

"THE COURT: [Counsel], you agree or do you agree that had [Avila] been contacted, she would have said that [defendant] was at the junta, that he was at a gang meeting[?]

DEFENSE COUNSEL: Yes, Judge."

¶ 59    The State's evidence at trial established that this was a gang-related, drive-by shooting. Prior to the testimony of Francisco Ortiz, defendant's trial counsel successfully prevented the State from introducing any testimony about defendant's gang affiliation. Pursuant to the trial court's ruling, Ortiz did not identify defendant as a member of any gang. While Ortiz testified that defendant had told him that members of the Latin Dragons had dented the passenger side of his vehicle, a dent—by itself, without any further evidence of gang animus or affiliation—is not a particularly strong motive for premeditated murder. By blocking Ortiz from testifying about defendant's gang membership, trial counsel undermined the State's only evidence of motive and distanced defendant from a gang-related shooting.

¶ 60    Defendant's *pro se* petition, sworn to under penalties of perjury and later verified, admitted that defendant had discussed with his trial counsel whether to call Avila as an alibi witness. According to defendant, counsel had explained his reasons for not calling her as follows: " 'I didn't think it was a good idea to present some young, Latina, female who would put you at a junta with some

Latin Kings as an alibi defense. It would definitely get you convicted.' " Defendant admits that he agreed, deciding to defer to counsel's judgment. Defendant stated that "he thought trial counsel knew best."

¶ 61    Thus, the record shows (1) that defendant and counsel discussed the proposed witness; (2) that they already knew what this witness could offer the defense; (3) that defendant agreed with his counsel's decision not to call her; and (4) that there was a reasonable strategic reason to not call her, namely, to keep evidence of defendant's gang affiliation from the jury when he stood accused of a gang-related shooting. See *Peterson*, 2017 IL 120331, ¶ 80 ("a mistake in trial strategy *** will not alone render representation constitutionally defective"). For these reasons, we cannot find that trial counsel's performance was "objectively unreasonable under prevailing professional norms" for not further investigating and not calling this proposed alibi witness. *Domagala*, 2013 IL 113688, ¶ 36. As a result, we are not persuaded by defendant's claim of ineffective assistance of counsel. *Peterson*, 2017 IL 120331, ¶ 79 ("A failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel.").

¶ 62                                    V. Resentencing

¶ 63    Defendant's second claim is that his case should be remanded for resentencing because a sentencing scheme that mandates a *de facto* life in

prison for a juvenile offender violates the eighth amendment and the proportionate penalties clause.

¶ 64        In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the United States Supreme Court found that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Following *Miller*, our supreme court has "emphasized that a mandatory sentencing scheme for juveniles prevents the trial court from considering numerous mitigating factors." *People v. Reyes*, 2016 IL 119271, ¶ 3 (*per curiam*). As a result, our supreme court requires that a sentencing judge " 'must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.' " *Reyes*, 2016 IL 119271, ¶ 3 (quoting *Miller*, 567 U.S. at 489). *De facto* life without parole must "be based on judicial discretion rather than statutory mandates." *Reyes*, 2016 IL 119271, ¶ 4.

¶ 65        In *Reyes*, as in the case at bar, the trial court did not state that it was imposing life without the possibility of parole. *Reyes*, 2016 IL 119271, ¶ 5. Instead, "the various sentencing statutes to which [the *Reyes* defendant] was subject had combined in such a way so as to eliminate all judicial discretion and impose on him a mandatory prison term." *Reyes*, 2016 IL 119271, ¶ 5. As a result, our supreme court found that the sentence in *Reyes* constituted cruel and

unusual punishment, vacated it, and remanded for resentencing, under the new sentencing law for juveniles. *Reyes*, 2016 IL 119271, ¶¶ 9, 11.

¶ 66    Our legislature has enacted a new sentencing law for juveniles, since defendant was sentenced in 2006, that requires a sentencing court to take into account certain mitigating factors and, most importantly for this case, frees the sentencing court from having to impose otherwise mandatory firearm enhancements. *Reyes*, 2016 IL 119271, ¶ 11; 730 ILCS 5/5-4.5-105 (West 2016). Those enhancements are now a matter of discretion for the sentencing court. *Reyes*, 2016 IL 119271, ¶ 11; 730 ILCS 5/5-4.5-105(b), (c) (West 2016).

¶ 67    In the instant case, defendant was 15 years old on April 1, 2000, the date of the offense. On June 9, 2005, defendant was sentenced in an unrelated case to 20 years for attempted first degree murder prior to the disposition of the first degree murder charge. On December 28, 2006, he was sentenced on the first degree murder charge to 45 years with IDOC. The 45-year sentence was the mandatory minimum sentence he could have received, and it included a 25-year mandatory enhancement for personally discharging a firearm. See 730 ILCS 5/5-8-1(a)(1)(a) (West 2006) ("for first degree murder" the minimum adult sentence "shall not be less than 20 years"); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006) ("if, during the commission of the offense, the person personally discharged a firearm that proximately caused *** death ***, 25 years or up to a

term of natural life shall be added to the term of imprisonment imposed"). In other words, at that time, the trial court had no alternative but to sentence defendant to 45 years, to run consecutively with the 20-year sentence. 730 ILCS 5/5-8-4(a)(i) (West 2006).

¶ 68      Then, in 2012, in *Miller*, 567 U.S. at 479, the United States Supreme Court found that the eighth amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Next, in 2016, in *Reyes*, 2016 IL 119271, ¶ 4, our supreme court found that *de facto* life imprisonment for a juvenile must "be based on judicial discretion rather than statutory mandates." As a result of these two landmark decisions, the sentence in this case became *de facto* life imprisonment. Defendant would be 80 years old when released, since he had to serve 100% of the 45-year sentence (see 730 ILCS 5/3-6-3(a)(2)(i) (West 2016) (a prisoner serving a term for first degree murder "shall receive no sentence credit and shall serve the entire sentence imposed")) and 85% of the 20-year sentence (see 730 ILCS 5/3-6-3(a)(2)(ii) (West 2016) (a prisoner serving a sentence for attempted murder "shall receive no more than 4.5 days of sentence credit for each month" served or no more than 54 days per year, which is 15%)).[3]

_____

[3] The 20-year sentence served at 85% is 17 years. Seventeen years, plus forty-five years for the murder sentence is sixty-two years. However, at sentencing, defendant received a credit for time served of just over four years. Sixty-two years

27

¶ 69    Then, in 2019, our supreme court decided *Buffer*. This decision only strengthened our conclusion, which we had previously reached under the 2012 *Miller* and 2016 *Reyes* decisions.  In *Buffer*, our supreme court found, pursuant to *Miller*, that a sentence over 40 years constitutes *de facto* life imprisonment for a juvenile and violates the eighth amendment, unless the trial court considered the defendant's youth and its attendant characteristics before imposing it. *Buffer*, 2019 IL 122327, ¶ 42; *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 3.  In its 2020 supervisory order to this court, the supreme court asked us to reconsider our prior decision in this case in light of its 2019 *Buffer* decision.  We do, and we find that the decision in *Buffer* "to draw a line at 40 years" erases any possible doubt, in the case at bar, that defendant's longer mandatory term in prison is *de facto* life and requires a new sentencing hearing. *Buffer*, 2019 IL 122327, ¶ 40.  Thus, we must vacate his sentence and remand for a new sentencing hearing.  At defendant's resentencing, the trial court will have the discretion to impose or not impose the 25-year firearm enhancement. *Reyes*, 2016 IL 119271, ¶ 11; 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006) ("if, during the commission of the offense, the person personally discharged a

---

minus four years meant that he had fifty-eight years more to serve at the time of sentencing. At the time of sentencing, defendant was 22 years old. Fifty-eight years more to serve for a twenty-two-year old means that he would not be released before age eighty.

firearm that proximately caused *** death ***, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed").

¶ 70     We are aware that the trial court will still be statutorily required to impose a mandatory 20-year sentence for murder (730 ILCS 5/5-4.5-20(a) (West 2018)) and to impose it consecutively to the 20-year sentence for attempted murder (730 ILCS 5/5-8-4 (d)(1), (8) (West 2018)), thereby creating a statutorily-mandated minimum of 40 years in prison. The consecutive nature of the sentence is an attribute of the murder sentence.  We have not been asked to consider whether the statutorily-mandated imposition of a consecutive sentence, as applied to defendant here, violates *Buffer*, the eighth amendment and the proportionate penalties clause by robbing the trial court of the discretion to decide whether or not to impose a 40-year sentence in light of defendant's youth and particular attributes.  Thus, we do not consider this issue at this time.

¶ 71                              CONCLUSION

¶ 72     In this appeal, defendant appealed the second-stage dismissal of the following two claims: (1) that he had made a substantial showing of ineffective assistance of trial counsel because counsel had failed to investigate an alibi witness and failed to call her to testify that defendant was at a gang meeting with her at the time of the shooting and (2) that his case should be remanded for resentencing because *de facto* life imposed against a juvenile offender, as the

result of mandatory sentencing laws, violates the eighth amendment and the proportionate penalties clause.

¶ 73       For the foregoing reasons, we did not find his first claim persuasive, but we vacate his sentence and remand for resentencing where the trial court has discretion to impose or not impose the firearm enhancement.

¶ 74       Affirmed in part and vacated in part; cause remanded with directions.