2021 IL App (1st) 180488-U

No. 1-18-0488

Order filed March 31, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 2281901 |
| | ) | |
| CARRITTISI MEANS, | ) | Honorable |
| | ) | Michele McDowell Pitman, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for home invasion and armed robbery affirmed. Circuit court did not err in denying motion for new trial based on claim that defendant received ineffective assistance of counsel.

¶ 2    Following a jury trial, defendant Carrittisi Means was found guilty of home invasion and

armed robbery with a firearm and sentenced to 23 years' imprisonment. On appeal, defendant

contends that the trial court—after conducting a hearing pursuant to *People v. Krankel*, 102 Ill.

2d 181 (1984)—erred by denying his motion for a new trial based on ineffective assistance of trial counsel. We affirm.

¶ 3                                    BACKGROUND

¶ 4      In November 2013, defendant was charged in a nine-count indictment with, among other crimes, home invasion while armed with a firearm (720 ILCS 5/19-6(a)(3) (West 2012)) and armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2012)). The case proceeded by way of jury trial.

¶ 5      At trial, Andrew Palmer testified that around 9:30 p.m. on November 11, 2013, he met two people at City Life Lounge in Chicago. Palmer denied knowing defendant and did not notice defendant at the lounge. About 20 minutes after arriving, Palmer left the lounge and drove to his home in Matteson. When Palmer got home, he parked his car in his garage. As he did so, Palmer saw a man that he later identified in court as defendant approach the garage. Defendant was wearing black clothing, gloves, a black skull cap, and was holding a gun. Palmer testified that defendant pointed the gun at his face, grabbed his neck, choked him and asked him for money.

¶ 6      Palmer told defendant he did not have any money but offered his watch and gold chain necklace. Defendant then asked for Palmer's diamond earrings. Palmer took off his left diamond earring and gave it to defendant. Defendant placed the items in his jacket pocket and left, telling Palmer to close the garage door. As the garage door closed, defendant tripped the garage door's sensor.

¶ 7      Palmer followed defendant and saw him get into the passenger's side of a dark colored minivan across the street. Palmer got into his vehicle, called 9-1-1, and began following the

minivan. Palmer stayed on the line with the 9-1-1 operator as he tailed defendant. Eventually, police cars located the minivan, and the 9-1-1 operator instructed Palmer to terminate his chase.

¶ 8     Chicago Ridge police officer James Vodicka testified that in November 2013, he worked as a patrol officer with the Matteson Police Department. Officer Vodicka testified that on November 11, 2013 at approximately 11:10 p.m., he received a dispatch reporting an armed robbery and that the victim was driving a Range Rover in pursuit of the offender southbound on Interstate 57. After receiving additional updates from dispatch, Officer Vodicka traveled to a location near the intersection of Governors Highway and Sauk Trail, where he visually acquired a black minivan that met a description of the offender's vehicle traveling east on Sauk Trial.

¶ 9     At that point, the offender's vehicle made a U-turn and began traveling west on Sauk Trail. With his lights, siren, and floodlight activated, Officer Vodicka turned on Sauk Trail and began following the minivan. Defendant did not stop. Instead, defendant drove through a shopping center parking lot before driving back onto Governor's Highway, where he began driving northbound at approximately 80 miles per hour (twice the posted speed limit of 40, according to Officer Vodicka). Eventually, defendant drove into a residential neighborhood on 213th Place in Matteson, where, according to Officer Vodicka, he began driving "on the sidewalk and front yards of the houses on the north side of the street."

¶ 10     After some time, the minivan stopped in front of a house. At that point, Officer Vodicka observed "an unknown male black" get out of the front passenger door and begin run east "for a brief moment" before running north between a house and a garage. Officer Vodicka began to pursue the individual on foot. However, he terminated the chase when he realized that other officers were also in pursuit and that the minivan was beginning to drive again. Eventually,

Officer Vodicka stopped the minivan and apprehended a woman who was driving. After placing the women in custody, Officer Vodicka received a dispatch informing him that Matteson Police Officer James Murray had apprehended defendant.

¶ 11    Officer Murray testified that on the evening of November 11, 2013, he responded to a dispatch reporting an armed robbery that described the offender driving a blue minivan. While responding, Officer Murray located the minivan near 213th Place and Towe Avenue in Matteson. Officer Murray eventually saw a person who he identified in court as defendant exit the minivan from the front passenger door and begin running. Officer Murray then exited his vehicle and gave chase. After less than a minute, Officer Murray, with the assistance of two officers from the Richton Park Police Department, apprehended defendant in the front yard of a home located at 3809 213th Street. After apprehending defendant, Officer Murray, along with Matteson Police Officer Rasheem Beck, retraced the steps of defendant's flight and, near a spot where defendant had slipped and fell during the chase, recovered a handgun with a round chambered, a 10-round magazine, a Bluetooth earpiece, a black knit cap, and a pair of gloves.

¶ 12    Matteson Police Detective Robert Christensen testified that on November 12, 2013, he interviewed Palmer. Palmer told Detective Christensen that defendant took a watch, necklace and earring. Detective Christensen then checked an inventory listing property that was recovered from defendant and saw that a diamond earring had been recovered from the inside pocket of the jacket defendant was wearing when he was arrested. Detective Christensen showed the earring to Palmer, who identified it as belonging to him. Palmer then contacted his wife, who brought the other earring that matched the earing recovered from defendant to the police station.

¶ 13   Detective Christensen also interviewed defendant. Defendant told Detective Christensen that on the evening of November 11, 2013, he was at a bar with his wife when he saw Palmer. Defendant stated that he knew Palmer because they had made drug transactions in the past and Palmer owed defendant money.

¶ 14   When Palmer saw defendant, he left and defendant and his wife got into their minivan and followed him. Defendant's wife parked the minivan across the street from the house where Palmer had parked. Defendant exited the vehicle with a gun in his hand. He walked into the garage, pointed the gun at Palmer, and asked Palmer for money. Defendant said he wore gloves so that he did not leave his fingerprints behind. Palmer told him he did not have any money and gave defendant his watch and necklace. Defendant said he threw the watch and jewelry on the ground after he left the garage. Defendant and his wife left, and Palmer followed them. Then, police began to follow them. When they stopped, defendant ran between houses and threw the gun to the ground.

¶ 15   The State then rested its case.

¶ 16   Defendant testified that he knew Palmer as "Eric," someone to whom he had sold drugs about eight times. According to defendant, he last met Palmer a few months before to conduct a drug transaction. During the transaction, defendant assumed that Palmer wanted to buy four pounds of marijuana (which was evidently Palmer's usual order), but Palmer only wanted two pounds. Nonetheless, defendant gave Palmer four pounds of marijuana and expected Palmer to pay the remaining $5,000 balance the next time they saw each other. Defendant contacted Palmer eight times to obtain payment, but Palmer never responded.

¶ 17 On November 11, 2013, defendant was with his wife at City Life Lounge when he saw Palmer arrive with two women. Defendant spoke with Palmer, and they decided to go to Palmer's house to get defendant's money. Defendant and his wife followed Palmer to his house. As Palmer pulled into his garage, defendant's wife parked across the street. Defendant entered Palmer's garage and approached Palmer's vehicle, and Palmer handed him a watch and gold chain. Defendant testified that he did not see an earring. Defendant initially placed the watch and chain in his jacket pocket but later threw them on the ground, because he believed Palmer owed him more than the watch and chain were worth. Defendant testified that he left his gun in the minivan when he went into Palmer's garage and denied ever pointing a gun at Palmer.

¶ 18 Defendant testified that he saw Palmer following them as his wife drove away. Fearful that Palmer might shoot at his vehicle, defendant retrieved his gun from a drawer under the passenger seat. After driving for a time, defendant's wife stopped the minivan in a residential area and defendant left the vehicle and ran. Defendant explained that he did not stop for the police because he was a felon and there was a gun in the car. Defendant admitted that he threw the gun into some bushes as he fled from the police on foot, but he denied telling Detective Christensen that he pulled a gun on Palmer. Defendant reviewed a statement while he was in custody, but he did not sign it because it did not state exactly what he had said.

¶ 19 Defendant then rested.

¶ 20 In rebuttal, the State called Assistant State's Attorney (ASA) Ericka Gilliam-Booker and recalled Detective Christensen. Detective Christensen testified that defendant did not mention speaking to Palmer at the bar. Instead, defendant told Detective Christensen that he knew Palmer as "Earl" and had conducted drug transactions with him in the past. Defendant told Detective

Christensen that he thought Palmer would "lead him to where some money would be," so when Palmer left the bar, defendant and his wife watched to see what vehicle he got into and followed him. When Palmer parked in his garage, defendant, wearing a ski mask, approached his vehicle and demanded his money. He said Palmer owed him $1,500. Defendant did not sign a written statement.

¶ 21    ASA Gilliam-Booker testified that defendant told her that he knew Palmer as "Eric." After he and his wife followed Palmer to his house, defendant said that he approached Palmer in his garage, showed his gun, and demanded his money. Defendant said he would ask Palmer's wife where his money was. Defendant said the gun was a loaded .40 caliber black gun, and he tossed it into a yard when he ran from police.

¶ 22    After deliberating, the jury found defendant guilty of home invasion and armed robbery with a firearm. Defense counsel filed a motion for a new trial, and defendant filed a *pro se* motion for a continuance asking the court to provide him with transcripts and to allow him to file his own motion based on ineffective assistance of trial counsel.

¶ 23    The court conducted a preliminary inquiry into defendant's claims of ineffective assistance. During that proceeding, defendant maintained that his trial attorneys failed to investigate his version of events and did not present evidence to support his testimony. Defendant alleged that his trial attorneys should have (1) obtained surveillance footage from City Life Lounge, (2) called witnesses, and (3) played the 9-1-1 recording at trial (which defendant believed would have impeached Palmer). After that initial inquiry, the court appointed new post-trial counsel.

¶ 24    Through counsel, defendant then filed an amended motion for new trial pursuant to *Krankel*. In the motion, defendant alleged that trial counsel was ineffective for failing to (1) investigate potential evidence and witnesses at the City Life Lounge, (2) play the 9-1-1 recording to impeach Palmer, and (3) elicit testimony, cross-examine, and make objections.

¶ 25    At the hearing on his motion, defendant testified that he told trial counsel to investigate cameras at the City Life Lounge. He also told his trial counsel to interview (1) defendant's wife, (2) Palmer, (3) Palmer's wife, and (4) a woman named Zuanetta Dallas. Defendant testified that he told his trial attorney about Dallas before trial, but he did not know Dallas's contact information.  Defendant stated that trial counsel did not investigate the cameras or interview witnesses from the City Life Lounge.

¶ 26    On cross-examination, defendant stated that when he got to the bar, Dallas was already there and joined him and his wife. (That testimony, however, stood in contrast to defendant's trial testimony, wherein he failed to mention Dallas after being asked if he saw anyone he knew at the City Life Longue.)

¶ 27     Dallas testified that she was at the City Life Lounge on November 11, 2013. While there, Dallas saw defendant and his wife. Dallas stated that when Dallas first saw defendant, he was in a heated conversation at the bar with a man she did not recognize. When defendant and the man finished talking, Dallas spoke with defendant and his wife at the bar. Dallas testified that no one contacted her about being a witness at defendant's trial. Dallas heard that defendant had been arrested but did not get in touch with defendant's wife until several years later.

¶ 28    Following Dallas's testimony, post-trial counsel played a recording of Palmer's 9-1-1 call. Defendant then rested.

¶ 29 The State then presented the testimony of defendant's trial attorneys, Assistant Public Defender Julie Willis and Assistant Public Defender Clork Jackson. Willis testified that before trial, she met with defendant on the dates of his court appearances and visited him at the jail at least four times to discuss the case and prepare for trial. Willis asked defendant about what occurred, who he thought it would be helpful for Willis to talk to, and if he knew of any potential witnesses. Defendant told Willis to talk to his wife and Palmer. Willis told defendant that his wife would not make a good witness "because there is already a video evidence of her telling a lie, and she already pleaded guilty to the fleeing and eluding, and she was his wife." Willis sent an investigator to speak with Palmer; he denied knowing defendant prior to the incident.

¶ 30 Willis then explained that defendant did not ask her to speak with any other potential witnesses. Willis testified that defendant did not mention Dallas. She further testified that she did not send an investigator to the City Life Lounge because she did not have any leads to follow there. She explained that if defendant had indicated  that there was someone at the bar who could have told her something, she would have sent an investigator. She did not know if defendant told her there were cameras at the bar.

¶ 31 With respect to the 9-1-1 tape, Willis testified that she played the tape for defendant and highlighted inconsistencies between the police reports and statements made during Palmer's 9-1-1 call. However, Willis testified that she explained to defendant that the Palmer sounded "like a person who was scared, who had been through some trauma[]" and that "any benefit that might come from any minor inconsistencies would be far outweighed by the damaging nature of that call."

¶ 32    Jackson testified that he never heard Dallas's name mentioned, and he stated that defendant did not mention any other witnesses he wanted Jackson to speak with prior to trial. Jackson testified that defendant never told him that there was video surveillance from inside City Life Longue. Jackson stated that he discussed the 9-1-1 tape with defendant but ultimately decided against playing it at trial because he believed it would cause the defense more harm than good.

¶ 33    After the *Krankel* hearing, the court denied defendant's motion to reconsider and amended motion for new trial. In doing so, the court found that defendant failed to show that trial counsels' performance was ineffective for failing to investigate any possible evidence at the City Life Lounge. The court stated that there was no showing that there was any video or capability of video at the lounge, or that any witnesses would have come about as a result of any video. Although defendant testified that he told Willis about Dallas as a potential witness, Willis testified that he did not tell her about Dallas. When defendant told Willis that she should speak with his wife, she did, and when he asked her to speak with Palmer, Willis sent an investigator to speak with him. The court found counsels' performance was not deficient in any manner and did not fall below an objective standard of reasonableness.

¶ 34    The court also found that it was reasonable trial strategy to not play a recording of Palmer's 9-1-1 call. The court noted that Palmer sounded scared during the call and clearly indicated (1) that he had been robbed, (2) what the offender did, (3) what the offender took, and (4) where he was located.

¶ 35    The court further found that, even if trial counsels' performance had fallen below an objective standard of reasonableness, there was not a reasonable probability that the results of the

trial proceedings would have been different. The court reasoned that defendant and Palmer had testified before the jury, defendant's theory had been presented to the jury and the jury had not been persuaded by it.

¶ 36    The court then held a sentencing hearing. The court ultimately sentenced defendant to 8 years for home invasion, plus a 15-year enhancement because defendant was armed with a firearm (720 ILCS 5/19-6(a)(3), (c) (West 2012)), for a total of 23 years imprisonment, and 8 years for armed robbery, plus a 15-year enhancement because defendant was armed with a firearm (720 ILCS 5/18-2(a)(2), (b) (West 2012)), for a total of 23 years imprisonment. Both 23-year terms were to be served concurrently. This appeal followed.

¶ 37                                  ANALYSIS

¶ 38    On appeal, defendant claims the trial court erred in denying his motion for a new trial based on ineffective assistance of counsel because the court failed to consider the impact Dallas' testimony would have had on the trial evidence. We disagree.

¶ 39     A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., Amends. VI, XIV; Ill. Const. 1970, Art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test originally set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Mahaffey*, 165 Ill. 2d 445, 457 (1995). "First, the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *Id.* at 457-58. To show this, the defendant must establish that counsel's performance was below an objective standard of reasonableness. *People v. Mercado*, 397 Ill. App. 3d 622, 633 (1st Dist. 2009). This requires a defendant to

"overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Manning*, 241 Ill. 2d 319, 327 (2011) (quoting *People v. Smith*, 195 Ill. 2d 179, 188 (2000) (internal citations omitted). "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Id.*

¶ 40 Second, the defendant must also demonstrate prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahaffey*, 165 Ill. 2d at 458. A defendant must satisfy both prongs of the *Strickland* test, and the failure to demonstrate either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 41 When, as in this case, a defendant lodges a post-trial *pro se* allegation of ineffective assistance, "the trial court should first examine the factual basis of the defendant's claim." *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the court finds that the defendant's allegations indicate possible neglect of the case, the matter proceeds to a *Krankel* hearing, "an adversarial proceeding in which new counsel must be appointed to represent the defendant on his *pro se* claim of ineffective assistance." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 82 (citing *Moore*, 207 Ill. 2d at 78). If the court concludes from the *Krankel* hearing that the defendant did not receive effective assistance of counsel, the court should order a new trial. *Krankel*, 102 Ill. 2d at 189. If, however, the court determines defendant received effective assistance of counsel, the court "shall deny a new trial and leave standing defendant's conviction and sentence." *Id.*

¶ 42 On appeal, the standard of review for *Krankel* claims varies depending on the procedure employed by the trial court and whether it made a determination on the merits. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 50; *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. When, as

here, the circuit court resolves the defendant's claims of ineffective assistance on the merits, we will reverse only if the court's determination was manifestly erroneous. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25-26. A manifest error is that which is clearly evident, plain, and indisputable. *Id.* at ¶ 25 (citing *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 43    Defendant argues that the circuit court's determination was manifestly erroneous because, had his attorneys investigated the City Life Lounge, they could have learned of potential witnesses on their own. Defendant argues that he was prejudiced because, although the jury was presented with his testimony, it was uncorroborated and, had counsel discovered and presented Dallas' testimony at trial, there was a reasonable probability that the outcome would have been different.

¶ 44    "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v. Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691). This duty includes an obligation to independently investigate any possible defenses. *People v. Kokoraleis*, 159 Ill. 2d 325, 329 (1994). "Lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, 'applying a heavy measure of deference to counsel's judgments.' " *Id.* at 330 (quoting *Strickland*, 466 U.S. at 691). Where the record shows that defense counsel had reason to know that a possible defense was available, the failure to investigate fully can constitute ineffective assistance of counsel. *Domagala*, 2013 IL 113688, ¶ 38; see *People v. Tate*, 305 Ill. App. 3d 607, 612 (1st Dist. 1999) (counsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware, including

the failure to call witnesses whose testimony would support an otherwise uncorroborated defense).

¶ 45    However, "[a]n attorney cannot be said to be ineffective for failing to call a witness whose * * * potential testimony [is], through no fault of the attorney, unknown to him or her." *People v. Humphries*, 257 Ill. App. 3d 1034, 1043 (2d Dist. 1994). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691.

¶ 46    After reviewing the record, we find the circuit court's ruling that defendant failed to establish a claim of ineffective assistance of counsel was not manifestly erroneous. The record shows that prior to trial, Willis investigated the information that defendant provided to her. Specifically, Willis spoke with or sent an investigator to speak with the witnesses—Palmer and defendant's wife—who defendant said were present at the lounge. Willis spoke with defendant's wife and sent an investigator to speak with Palmer. Palmer denied knowing defendant. Although at the *Krankel* hearing, defendant testified that he told trial counsel about Dallas, both of defendant's trial attorneys testified that defendant never mentioned Dallas to them prior to trial. Dallas, for her part, testified that although she saw defendant and his wife at the lounge, she did not reach out to defendant's wife until several years later. And for *his* part, defendant did not mention Dallas at trial, even though he was asked on cross-examination if he saw anyone he knew at City Life Lounge.

¶ 47    Defendant further testified that he told Willis to investigate cameras at the lounge. Willis did not know whether defendant told her there were cameras at the lounge but testified that she would have sent an investigator to the lounge if defendant had indicated there had been someone there who could have told her something or if she had "any leads to follow." Jackson testified that defendant did not tell her there was video surveillance inside the bar.

¶ 48    Given this record, the circuit court was faced with a credibility determination and apparently found counsels' testimony more credible than that of defendant. We will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. See, *e.g., People v. Evans*, 209 Ill. 2d 194, 211 (2004); *People v. Moody*, 2016 IL App (1st) 130071, ¶ 52. In announcing its decision denying defendant's motion for a new trial, the court noted that it had presided over defendant's trial and was familiar with the case. After considering the evidence presented at the *Krankel* hearing, the court found counsels' performance was "not deficient in any manner" and did not fall below an objective standard of reasonableness. Nothing in the record suggests that the opposite conclusion was clearly evident and, thus, the court's determination that defendant's attorneys' performance was not deficient was not manifestly erroneous. See *Morgan*, 212 Ill. 2d at 155; *Tolefree*, 2011 IL App (1st) 100689, ¶ 25-26.

¶ 49    As defendant did not demonstrate deficient performance, the *Strickland* claim fails, and we need not consider his prejudice argument. *Simpson*, 2015 IL 116512, ¶ 35.

¶ 50                                    CONCLUSION

¶ 51    For the foregoing reasons, we affirm the trial court's judgment.

¶ 52    Affirmed.