2021 IL App (2d) 180984-U
No. 2-18-0984
Order filed September 22, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04-CF-289 |
| JASON J. DRIVER, | ) ) ) | Honorable James M. Hauser, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in its third-stage denial of defendant's postconviction petition alleging ineffectiveness of trial counsel. (1) Counsel could have made the strategic decision not to seek exclusion of DNA evidence that did not meaningfully connect defendant to the crime, and defendant was not prejudiced by this decision. (2) Defendant was not prejudiced by counsel's failure to preserve the claim that the trial court erred in excluding evidence of illicit drugs in the victim's system shortly after the crime, as there was no indication that the drugs impaired the victim. (3) Defendant was not prejudiced by counsel's failure to tender an instruction on eyewitness identifications, where its content was covered by another instruction that was provided.

¶ 2    After a jury trial, defendant, Jason J. Driver, was convicted of armed robbery (720 ILCS

5/18-2(a)(1) (West 2004)) and acquitted of attempted first-degree murder (*id.* §§ 8-4(a), 9-1(a)(1))

based on an accountability theory. He was sentenced to 30 years' imprisonment. After the same trial, his codefendant, Edmond Ellis, who was represented by separate counsel, was convicted of armed robbery (*id.* § 18-2(a)(4)) and, as a principal, attempted first-degree murder (*id.* §§ 8-4(a), 9-1(a)(1)). Defendant now appeals a judgment denying his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)). We affirm.

¶ 3                                                            I. BACKGROUND

¶ 4        On September 17, 2004, between 5:30 and 6 p.m., two men entered the Short Stop, also called the Oky-Doky, a convenience store in Freeport. Each robbed the cash register, and one of them shot and wounded the clerk on duty, Bader-Aldin Alkabalny. The State indicted Ellis and defendant, alleging that Ellis was the shooter. At trial, the primary contested issue as to both defendants was identity. We summarize the pertinent trial evidence.

¶ 5        Gloria Driver testified on direct examination that she was defendant's aunt and lived in Freeport. On September 17, 2004, she was walking to a service station to get change. She did not recall the precise time. She passed the Oky-Doky on the other side of the street. She saw that there were four men in a gray car in the Oky-Doky parking lot. Defendant was also there, wearing a black hooded sweater. Driver hollered at defendant, but he said nothing. Driver entered the service station. A man said that someone had just gotten shot. Driver exited and saw Alkabalny on a stretcher. Eventually, Driver joined a crowd outside a duplex on Carroll Street. She saw defendant and Ellis exit the duplex, accompanied by police officers.

¶ 6        Driver testified on cross-examination by Ellis's attorney as follows. On September 20, 2017, she met at her home with Detective Steve Stovall and another officer. She told them that three days earlier, she had seen defendant in the Oky-Doky parking lot and that, when she called

to him, he did not respond but looked at her. He was wearing a black sweater with the hood up. She did not remember another man being with him. The cross-examination continued:

"Q. Were—were you offered money to testify today?

A. No.

Q. Are you—are you certain of that?

A. He said a remark [at Driver's home] about payment arrangement, but—

Q. Slow down and go back again. What—what happened?

A. *** I just said—it was a statement made.

Q. Okay. Let's clarify that statement ***. What is that statement?

A. But it had nothing to do with today.

Q. Well, who offered you something? What did they offer you? What for?

A. I wasn't offered anything.

Q. Okay. What—what are you talking about then?

A. Well, he said I heard that you was [*sic*] at the scene.

Q. Okay. When you say he said I heard you were at the scene—

A. Stovall. Mr. Stovall.

Q. Detective Stovall said that? He said when he heard you were at the scene what?

A. And then I was just kidding. I said it ain't like I'm getting paid. I was playing. He said that could be arranged.

Q. He said—

A. Some—something like that.

Q. Detective Stovall said about you getting paid that that could be arranged.

A. Yeah. But I was just—I didn't mean it when I said that.

Q. Okay."

¶ 7    Hyder Al-Azzawi testified that he was inside the Short Stop when it was robbed by two black men wearing sweatshirts with the hoods pulled up. One man fired a shot into the ceiling, made Alkabalny give him bills from the register, told the other man to take change from the register, then shot Alkabalny. The other man wore a pink mask over his mouth and chin. Martha Ortiz, who lived at 1013 South Carroll, testified that between 5:30 and 6 p.m., she was on her front porch and saw two people run by fast. Keith Carlbom, a state police crime scene investigator, testified that he recovered two spent .25-caliber Winchester shell casings from the store.

¶ 8    Several police officers and detectives testified to the events at 1121½ South Carroll on September 17, 2004. Detective Jeffrey Davis testified that he helped search 1121½ South Carroll, the upper residence of a duplex. Towana Dickens and her children resided there. In the kitchen, Davis opened an oatmeal container and removed a box of ammunition and a .25-caliber semiautomatic pistol with a live round in the chamber. To his knowledge, when Ellis and defendant exited the residence and were arrested, no weapons were found on either of them; they were not searched for cash. No cash was recovered from the apartment. At some point, Dickens and a young black male exited; to Davis's knowledge, neither was searched.

¶ 9    Officer Mark Marti testified that he set up a perimeter outside the duplex. Within a few minutes, Dickens's preteen daughter exited. She was upset, and another officer escorted her from the scene. Shortly afterward, Dickens and her teenage son came out onto the deck. Marti told them to come down, but they retreated inside. Later, after Ellis and defendant were arrested, Marti and other officers performed a protective sweep and found nobody in the apartment. Lieutenant Brian Kuntzelman testified that he saw Dickens and a young black male exit the duplex. At the

time, Kuntzelman had no idea that Dickens resided in the upstairs apartment. Neither person was searched, and they both crossed the street and went beyond the perimeter.

¶ 10    Officer Jo Lynn Sanders testified that, in the apartment's attic, the search team found a black hooded sweatshirt hidden under the floorboards. In a bedroom, Sanders found a piece of pink bed sheeting with portions missing. Officer Jennifer Manus helped to search the attic and recovered a dark sweatshirt and two pieces of pink sheeting from under the floorboards. Also recovered was a lighter blue sweatshirt.

¶ 11    Stovall testified that, on September 17, 2004, at about 4:45 p.m., he was driving home from work. In the 900 block of South Carroll, he saw Ellis and two women walk by across the street. At 6 p.m., Stovall drove to the duplex. He saw Ellis and defendant exit the rear door with their hands up. After the two suspects were handcuffed, Stovall joined in the entry into the apartment. The officers found nobody else inside. They obtained a warrant and returned to search the duplex. Stovall's testimony about the search was consistent with that of the other participants.

¶ 12    During a break in Stovall's testimony, the court and the parties held a sidebar to discuss the State's earlier motion *in limine* to exclude evidence that Alkabalny had drugs in his system at the time of the shooting and during his hospitalization shortly afterward. Ellis's attorney stated that Barry Barnes, the surgeon who treated Alkabalny, had disclosed that Alkabalny had tetrahydrocannabinol (THC) in his system. The court stated that the presence of THC, in itself, would not be probative of whether Alkabalny's ability to perceive, store, and recall events had been impaired. The assistant State's Attorney argued that the law did not allow the defense to elicit the drug-related testimony, especially as the hospital records and the emergency personnel who treated Alkabalny all stated that he was alert and oriented in all phases of his stay in the hospital.

¶ 13    After a recess, the court informed counsel that, for Barnes' opinion to be admitted, he would have to be questioned outside the jury's presence on whether, in his professional opinion, Alkabalny had been under the influence of THC. If Barnes had reason to believe that his patient had been under the influence, his testimony could be elicited; if not, the testimony would be barred. Evidence of the mere presence of THC in Alkabalny's system would not be admissible.

¶ 14    The State called Barnes. He testified that, in the emergency room, he discovered that a bullet had passed through Alkabalny's right lung and lodged near his spine. Alkabalny stayed in the hospital until September 21, 2004. On cross-examination by defendant's attorney, Barnes testified that he met with Alkabalny several times, the first being on September 17. During that meeting, Alkabalny seemed to be alert and answered all of Barnes's questions appropriately.

¶ 15    Defendant's attorney then asked Barnes whether a drug screen was performed on Alkabalny. The State objected. At a sidebar, defendant's attorney explained that he intended to elicit testimony that Alkabalny had drugs in his system that were not administered at the hospital and that these drugs could have altered his consciousness. Ellis's attorney added that these drugs included THC and amphetamines. The court had defendant's attorney question Barnes outside the presence of the jury. The questioning proceeded:

"Q. *** [D]o you recall the items, the substances that were in [Alkabalny's] system that were not given to him—the controlled substances that were in [Alkabalny's] system that were not given to him by any hospital personnel?

A. Yes, I do.

Q. Okay, what substances were those?

A. THC, marijuana, and amphetamine.

Q. ***

And the combination of those two substances, would they have—would they have altered [Alkabalny's] sense of conscienceness [*sic*]?

A. Oh, I'd say they could have.

Q. Okay. But you don't know if definitively they did or did not?

A. I didn't perceive it.

Q. Okay.

A. He answered every question I asked him appropriately.

Q. ***

What about those—the THC, marijuana, and amphetamines working in combination with the morphine? Would that have altered [Alkabalny's] sense of consciousness?

A. Certainly could have.

Q. Okay. Do you know if it did or not?

A. To my knowledge, no, it didn't.

Q. Okay.

A. He answered everything appropriately.

Q. Did [Alkabalny] have morphine in his system before or after you talked to him?

A. I honestly cannot answer that question. I do not know."

The court sustained the State's objection. The court explained that there was no evidence that Alkabalny was under the influence of any drugs when the crime occurred and that Barnes was not of the opinion that any drug use had impaired Alkabalny's ability to perceive and relate information. The trial court addressed Barnes, who confirmed this characterization of his views. Barnes's testimony before the jury concluded.

¶ 16    The trial court qualified Laurie Lee of the Rockford forensic science laboratory as an expert in DNA analysis.  On direct examination, she testified as follows.  She analyzed several DNA samples for this case.  The blue sweatshirt recovered from Dickens's attic yielded a mixture of the DNA of two people; one profile was a very strong match for Ellis but there was no match for defendant.  One of the pieces of pink sheeting yielded a profile that was a mixture of at least three people.  Ellis, defendant, and at least one other person could not be excluded from having contributed to this mixed profile.  The profile would be expected to occur in approximately one in three black people, one in four whites, or one in six Hispanic unrelated individuals.  The black sweatshirt contained a mixture of the DNA of at least three people.  Defendant and at least two other people could not be excluded.  Approximately one in four black, one in six white, or one in five Hispanic unrelated individuals could not be excluded as having contributed to this mixed profile at two loci.

¶ 17    On cross-examination by Ellis's attorney, Lee agreed that the nonexclusion of one in four blacks meant that "it would be a very common occurrence."  Defendant's attorney did not cross-examine Lee at length.  Lee testified that she could not say how long given DNA had been on a particular item.

¶ 18    Russell McLain, a firearm and tool mark examiner for the Illinois State Police, testified that he examined the .25-caliber shell casings recovered from the Short Stop and the semiautomatic firearm recovered from Dickens's apartment.  The casings had been fired from this gun.

¶ 19    Detective Jennifer Manus testified that at 9:30 p.m. on September 17, 2004, she showed two photo lineups to Alkabalny at the hospital.  Alkabalny identified Ellis from one lineup as the person who shot him and defendant from the other lineup as the second robber.  An officer who

accompanied Manus handed her the lineups; she did not know whether that officer or anyone else had shown them to Alkabalny earlier.

¶ 20    Alkabalny testified on direct examination as follows.  He was working behind the counter when the robbers entered.  Both were black men and wore hooded sweatshirts with the hoods up.  They were wearing what looked like pink bandannas over the lower parts of their faces.  One robber, whose sweatshirt was blue, went behind the counter, pulled out a gun, told Alkabalny they were holding him up, and fired a shot into the ceiling.  In court, Alkabalny identified this robber as Ellis.  The other, whose sweatshirt was black, took change from the register.  Alkabalny identified this robber as defendant.  Ellis ordered Alkabalny to open the cash register and then took bills out.  Ellis then told defendant to remove the change from the register, which defendant did.  Ellis then shot Alkabalny in the chest, and the robbers left the store.

¶ 21    Alkabalny testified that, two days before the robbery, Ellis had entered the Short Stop and purchased two single cigarettes.  Alkabalny had seen defendant in the store before September 17, 2004, though he could not specify when or how many times.  The robbery was the first time that Alkabalny had seen both men together in the store.

¶ 22    Alkabalny testified that, after being shot, he was taken to the hospital.  There, police officers showed him two photographic lineups.  At trial, Alkabalny identified Ellis's photograph as the one he had selected from the first lineup and defendant's photograph as the one he had selected from the second lineup.

¶ 23    Alkabalny testified on cross-examination that the robbers had pink bandannas or sheets covering their chins, their mouths, and part of their noses.  He could see their eyes and foreheads.

¶ 24    In the defense case, Ellis's attorney called Dickens.  On direct examination, she testified as follows.  On September 17, 2004, she was living in a four-bedroom apartment at 1121½ South

Carroll with her five children, the oldest of whom was her 14-year-old son. The apartment had entrances at both the front and the rear. The attic had space that the children used as a clubhouse, but Dickens had never seen Ellis or defendant there.

¶ 25    Dickens testified that, early in the day on September 17, 2004, she, her three-year-old child, and Ellis went to court. Dickens left for home at about 2 p.m. and Ellis went there separately. When Dickens arrived home, Ellis and defendant were sitting in the front bedroom, listening to music. Nobody else was there. Dickens put her child into another bedroom and started doing chores. Ellis and defendant stayed in the apartment but moved around. Ellis planned to help Dickens cook supper. At about 4:45 or 5 p.m., Dickens's pastor and his wife visited to pick up Dickens's son Corey for track, but Corey was still at school. The three-year-old and the two next-to-youngest children were now home but outside. Later, one of the children told Dickens that the police were there and had surrounded the building. Dickens stepped outside, but the police shouted something, and she stepped back inside. Ellis and defendant exited through the back door with their hands up. Dickens then went out the front door. She had her hands up, but the police did not disturb her.

¶ 26    Dickens testified on cross-examination as follows. On the day of the robbery, Ellis did not have a key to the apartment but stayed there about three nights a week. Dickens did not recall what Ellis and defendant were wearing on September 17, 2004, and she could not say whether the bedroom where they were sitting had any pink bedsheets. This bedroom was the farthest from the bathroom and the kitchen. After the police arrived, Dickens's 12-year-old daughter left the apartment, but Dickens did not see where she went.

¶ 27    The jury found Ellis guilty of attempted first-degree murder and armed robbery and found defendant guilty only of armed robbery. Defendant moved for a new trial. His motion did not

include an argument that the trial court erred in barring evidence that Alkabalny had illegal drugs in his system on September 17, 2004. The court denied defendant's motion and sentenced him as noted.

¶ 28    On direct appeal, defendant contended only that trial counsel was ineffective on grounds that are not relevant to the present appeal. We affirmed. *People v. Driver*, Nos. 2-05-0452 & 2-05-0453 cons. (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 29    In 2008, defendant filed a *pro se* petition under the Act, alleging that the State had knowingly used perjured identification testimony by Driver. The trial court dismissed the petition, but we reversed and remanded for second-stage proceedings. *People v. Driver*, No. 2-08-0798 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 30    On remand, defendant's amended petition repeated the perjury claim and also claimed that appellate counsel was ineffective for failing to argue that trial counsel had rendered ineffective assistance in several respects. Those pertinent here were (1) trial counsel should have objected to the DNA evidence as legally irrelevant; (2) trial counsel should have requested that the jury be given Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (IPI Criminal No. 3.15) on eyewitness identifications; and (3) trial counsel's posttrial motion should have contended that the trial court erred in excluding evidence that Alkabalny had illegal drugs in his system during the robbery.

¶ 31    The trial court granted the State's motion to dismiss the petition. We reversed and remanded for third-stage proceedings. *People v. Driver*, 2017 IL App (2d) 140354-U.

¶ 32    On remand, defendant, represented by counsel, filed an amended petition. The amended petition reiterated the claim that the State knowingly introduced perjured testimony by Driver and added a claim that defendant's trial counsel was ineffective for failing to pursue the matter by

introducing evidence or cross-examining Driver more thoroughly. The amended petition also alleged that trial counsel was ineffective for failing to object to the admission of the DNA evidence or challenge the results meaningfully. Defendant noted that Lee admitted at trial that many African-Americans had profiles that were consistent with those that were found to be consistent with defendant's profile. Defendant also reiterated the claims that trial counsel was ineffective for failing to preserve the issue of drugs in Alkabalny's system and for failing to request the use of IPI Criminal No. 3.15. Finally, defendant claimed that his appellate counsel had been ineffective for failing to raise any of these issues on direct appeal.

¶ 33 The cause proceeded to an evidentiary hearing before a judge who had not presided over the trial. The parties introduced new evidence only with respect to defendant's claim that Driver perjured herself at trial. The trial court rejected that claim, and defendant does not challenge that ruling on appeal. Accordingly, there is no need to detail the evidence that the parties introduced pertaining to the perjury claim. The parties submitted only arguments by counsel with respect to defendant's ineffective-assistance claims relating to DNA evidence, Alkabalny's drug use, and IPI Criminal No. 3.15.

¶ 34 In presenting his arguments, defendant relied heavily on the reasoning articulated in our 2017 order remanding the cause for an evidentiary hearing.

¶ 35 The State argued as follows. First, trial counsel's failure to offer IPI Criminal No. 3.15 was not unreasonable or prejudicial, because the court gave Illinois Pattern Jury Instruction, Criminal, No. 1.02 (4th ed. 2004) (IPI Criminal No. 1.02), which substantially covered the same issues. Specifically, IPI Criminal No. 1.02 instructed the jury that it was the sole judge of the believability of the witnesses and that, in considering the testimony of any witness, it could take into account "his ability and opportunity to observe, [his age], his memory, his manner while

testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in light of all the evidence in the case." *Id.* Moreover, giving IPI Criminal No. 3.15 would have supported Alkabalny's identification and not materially weakened Driver's identification. Second, trial counsel's decision not to object to the DNA evidence was a reasonable strategy because the limited probative value of the evidence was consistent with the defense's theory that the police rushed to judgment. Furthermore, counsel's performance in this respect was nonprejudicial because the generality and limited probative value of the DNA evidence made it unlikely that the jury would give it much value, as the State never denied that the evidence excluded only a limited population. Finally, trial counsel's failure to preserve the argument relating to Alkabalny's drug use was insignificant, because the evidence, including the testimony of the doctor who treated Alkabalny at the hospital, uniformly showed that Alkabalny was lucid and responsive at all pertinent times and that any drug use did not affect his ability to perceive the suspects or recall the robbery.

¶ 36 The trial court denied the amended petition. The court rejected defendant's perjury claim, finding that the evidence that the State presented at the postconviction hearing was more credible than the evidence that defendant presented. With respect to defendant's remaining claims, the court concluded that "trial counsel's deficiencies [did not] result in a substantial denial of [defendant's] constitutional rights." The court explained:

"Freeport is a small town of about 25,000 people. The duplex where [defendant] was found after the robbery/shooting was nearby the scene of the crime. The victim identified [defendant] shortly after the crime and again at the trial. It is very likely that the cashier would know, recognize and be familiar with [defendant]. [Defendant] was seen outside of the convenience store prior to the robbery/shooting. Witnesses of the fleeing

perpetrators directed police to the duplex where [defendant] and his accomplice were found. The weapon used in the crime was found in the duplex.

All of those facts were challenged at trial. [Defendant] had a fair trial with competent, although not perfect, representation. The jury found him guilty. This court finds the State's arguments on trial counsel's effectiveness persuasive and adopts them in full."

¶ 37 Defendant timely appealed.

¶ 38                                    II. ANALYSIS

¶ 39 On appeal, defendant contends that the trial court erred in denying his postconviction petition. Defendant does not contest the trial court's disposition of the petition's perjury claim. However, he argues that his three-part claim of ineffective assistance of appellate and trial counsel, on which neither party introduced evidence, established a constitutional violation. Defendant relies heavily on the reasoning in our 2017 decision, in which we held that he made a substantial showing on both the perjury and the ineffective-assistance claims so as to survive a motion to dismiss. Defendant reasons that he proved his ineffective-assistance claim because it turned solely on the preexisting record. He then argues that the ineffective-assistance claim, by itself, entitled him to relief.

¶ 40 As pertinent here, the State responds that our holding that defendant's claim survived the second stage had no bearing on the resolution of the claim at the third stage. The State also argues that defendant failed to make a substantial showing that he was deprived of effective assistance of counsel. For the following reasons, we agree with the State.

¶ 41 We first set out the basic guidelines. The Act sets forth three stages of review. At the first stage, the trial court may dismiss a postconviction petition as frivolous or patently without merit.

725 ILCS 5/122-2.1(a)(2) (West 2018); *People v. Domagala*, 2013 IL 113688, ¶ 32. If the petition

survives this low threshold, it advances to the second stage, at which the State may answer the

petition or move to dismiss the petition. 725 ILCS 5/122-4,122- 5 (West 2018); *Domagala*, 2013

IL 113688, ¶ 33. At this stage, the trial court must determine whether the petition and the

accompanying documentation make a " 'substantial showing of a constitutional violation.' " *Id.*

(quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). If the petition satisfies this standard,

the defendant is entitled to a third-stage evidentiary hearing at which the trial court acts as the fact

finder and determines whether the evidence introduced demonstrates that the defendant is entitled

to relief. *Id.* ¶ 34. The defendant bears the burden of making a substantial showing of a

constitutional violation at the third stage of proceedings. *People v. Pendleton*, 223 Ill. 2d 458, 473

(2006).

¶ 42    "When a petition is advanced to a third-stage, evidentiary hearing, where fact-finding and

credibility determinations are involved, we will not reverse a circuit court's decision unless it is

manifestly erroneous." *Pendleton*, 223 Ill. 2d at 473. "Manifest error is error that is 'clearly

evident, plain, and indisputable.' " *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (quoting *People

v. Morgan*, 212 Ill. 2d 148, 155 (2004)). However, our review is *de novo* if there are no findings

of fact or credibility determinations involved—*i.e.*, where no new evidence was presented, the

issues involved pure questions of law, and the postconviction judge did not have any special

expertise or familiarity with the issues. *Pendleton*, 223 Ill. 2d at 473.

¶ 43    The manifest-error standard of review applies here. The trial court heard new evidence

and made findings of fact and credibility assessments with respect to defendant's perjury claim.

The court then relied on its findings regarding the veracity of Driver's trial testimony when

analyzing whether defendant suffered prejudice in connection with his ineffective-assistance

claims ("[Defendant] was seen outside of the convenience store prior to the robbery/shooting."). Even though defendant does not challenge the court's factual findings and credibility assessments with respect to the perjury claim, that does not mean that those findings and assessments disappear. With that said, we note that the result of this appeal would be the same even if a *de novo* standard of review applied.

¶ 44 The governing principles are outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). In reviewing a claim of ineffective assistance, we apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the defendant must overcome the presumption that his counsel pursued a sound trial strategy. *Strickland*, 466 U.S. at 689. To sustain a claim of ineffective assistance, a defendant must show that his counsel's performance was deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient where he or she made errors that were so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant establishes prejudice where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. 687. In that respect, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 45 For the following reasons, we hold that the trial court's decision with respect to defendant's claims of ineffective assistance of counsel was not manifestly erroneous.

¶ 46 In arguing that he established ineffective assistance of counsel, defendant relies heavily on the reasoning in our 2017 order. At one point in his brief, without citing any authority, defendant

appears to argue that the law-of-the-case doctrine applies ("However, the arguments on the issues of ineffective assistance of counsel, provided by the State and adopted by the trial court, are entirely in contravention of the specific findings that this Court has previously decided to be the law of this case."). Contrary to what defendant asserts, case law establishes that a reviewing court's reasoning regarding the potential merits of a claim during one stage of postconviction proceedings does not become the law of the case and does not bind the trial court at a subsequent stage. See *People v. Shipp*, 2020 IL App (2d) 190027, ¶¶ 33-34. This stands to reason; were it otherwise, there would be little point in having three distinct stages of postconviction proceedings. Even if the law-of-the-case doctrine could apply with respect to a court's reasoning at an earlier stage of the proceedings, it plainly does not apply here, as we explicitly said in our 2017 order that we expressed no opinion on the ultimate merits of defendant's claims. *Driver*, 2017 IL App (2d) 140354-U, ¶ 88.

¶ 47    Additionally, much of our reasoning and analysis in our 2017 order was colored by the fact that there was, at that time, a legitimate dispute between the parties as to whether Driver testified truthfully at trial when she claimed that she saw defendant at the convenience store around the time of the crime. After hearing conflicting evidence on this point at the third stage of the proceedings, the trial court rejected defendant's perjury claim and determined that Driver testified truthfully at trial. Defendant does not challenge that ruling. Nevertheless, he clings to our reasoning in our 2017 order without recognizing that the evidence against him is much stronger now that Driver's testimony placing him at the scene of the crime is deemed reliable.

¶ 48    Defendant also suggests that it was incumbent on the State to introduce evidence at the third stage to counter what we said in our 2017 order. As noted above, however, defendant bore

the burden at the third stage to make a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. The State had no burden of proof or persuasion.

¶ 49    Defendant failed to show that his trial counsel performed deficiently by not objecting to the DNA evidence. The DNA evidence did not meaningfully connect defendant to the crime, as it merely lumped him into a large portion of the world's population that could not be excluded as contributors. Defense counsel may have strategically decided not to object to the DNA evidence precisely because it did not meaningfully connect defendant to the crime. Defendant introduced no evidence at the third-stage hearing to suggest that this was anything other than a strategic decision on counsel's part.

¶ 50    Moreover, defendant did not show a reasonable probability that, had his counsel not committed the three allegedly unprofessional errors, the result of his trial would have been different. The evidence against defendant was strong. Driver placed defendant at the scene of the crime, and, both shortly after the offense and at trial, Alkabalny identified him as one of the robbers. Shortly after the crime, defendant was found with Ellis in a house where the police recovered the gun used in the shooting and clothing that was consistent with what the perpetrators wore. Based on Dickens's testimony, Ellis and defendant were the only adult males in the house at the time. The police never recovered the stolen money, but they did not search everyone who left the house, and defendant and Ellis had time to hide or get rid of the cash before surrendering. On that point, trial testimony strongly suggested that the occupants of the house attempted to hide evidence before defendant and Ellis surrendered, as police officers recovered items linked to the crime in unusual locations in the house.

¶ 51    As defendant notes, Alkabalny had drugs in his system at the hospital after the shooting. But the emergency room doctor who treated Alkabalny indicated that Alkabalny answered

questions appropriately and did not seem to be in an altered state of consciousness. Defendant failed to present evidence at the third-stage hearing that Alkabalny was under the influence of drugs at the time of the crime such that it could have affected his identification of the perpetrators.

¶ 52     Defendant also contends that his trial counsel should have tendered IPI Criminal No. 3.15, which lists factors to consider when weighing witness identification testimony. Any alleged deficiency in this regard did not prejudice defendant, as the jury was given IPI Criminal No. 1.02, which directed the jury to consider, among other things, the witnesses' ability and opportunity to observe. Given that Alkabalny recognized defendant from previous encounters and that defendant's aunt placed him at the scene of the crime, there is no reason to suspect that the jury might have reached a different verdict had it received IPI Criminal No. 3.15.

¶ 53     Defendant failed to meet the deficient-performance requirement with respect to his claim of ineffective assistance based on his trial counsel's failure to object to the DNA evidence. Defendant failed to meet the prejudice requirement with respect to any of his three claims of ineffective assistance. Because defendant did not make a substantial showing of his trial counsel's ineffectiveness, defendant's appellate counsel was not ineffective for failing to raise these issues on direct appeal. See *People v. White*, 2021 IL App (1st) 170903, ¶ 38 (if the underlying claim would not have succeeded on direct appeal, then appellate counsel was not ineffective for failing to raise it). Accordingly, defendant did not meet his burden under *Strickland*. The trial court properly denied defendant's postconviction petition.

¶ 54                                    III. CONCLUSION

¶ 55     For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 56     Affirmed.