NOTICE
Decision filed 09/15/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190183-U

NO. 5-19-0183

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 12-CF-200 |
| | ) | |
| JOHN A. MORTON, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not commit manifest error when it denied the defendant's postconviction petition after an evidentiary hearing, and postconviction counsel fulfilled his duties, and since any argument to the contrary would lack merit, the defendant's appellate attorney is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 2    The defendant, John A. Morton, appeals from the circuit court's order denying his petition for postconviction relief following an evidentiary hearing. The defendant's court-appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks merit. On that basis, OSAD has filed a motion for leave to withdraw as counsel (see *Pennsylvania v. Finley*, 481 U.S. 551 (1987)), along with a memorandum of law in support thereof. The defendant has filed a *pro se* objection to OSAD's *Finley* motion. This court has examined OSAD's motion and memorandum of law, the defendant's *pro se* objection, as well as the entire

1

record on appeal, and has concluded that this appeal does indeed lack merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 3                                    BACKGROUND

¶ 4     In June 2012, the defendant was charged with a single count of aggravated battery (720 ILCS 5/12-3.05(b)(1) (West 2012)), a Class X felony (*id.* § 12-3.05(h)). He was accused of shaking his two-month-old son, T.M., causing significant brain injury. Later that June, the defendant was arrested on a warrant. He spent about one month in pretrial custody in the Marion County jail, and then bonded out. He was returned to the jail approximately 19 months later, when he was arrested on new charges in No. 14-CF-15.

¶ 5     On March 5, 2014, the defendant, his defense counsel, Steve W. Quinn, and an assistant State's attorney appeared before the circuit court. Defense counsel announced that the parties had reached a plea agreement that covered the instant case (*i.e.*, No. 12-CF-200) as well as No. 10-CF-209 and No. 14-CF-15. The assistant state's attorney detailed the plea agreement as follows: in the instant case, the defendant would plead guilty to the aggravated battery of T.M., and he would be sentenced to imprisonment for 20 years, to be followed by mandatory supervised release (MSR) for 3 years; in No. 10-CF-209, he would admit to the allegations in the petition to revoke probation, and he would be sentenced to imprisonment for 5 years, followed by MSR for 2 years, and in No. 14-CF-15, he would plead guilty to count II, a violation of the Illinois Food, Drug and Cosmetic Act (410 ILCS 620/1 *et seq.* (West 2014)), while counts I and III would be dismissed, and he would be sentenced to imprisonment for 4 years, followed by MSR for 2 years; and the sentences in the instant case and in No. 10-CF-209 would be concurrent with one another, but the sentence in No. 14-CF-15 would be consecutive to them. Defense counsel agreed that the terms had been

2

stated correctly. After being informed of the defendant's prior convictions, which were all traffic, the court accepted the parties' agreement.

¶ 6 The court fully admonished the defendant as to all three of the cases, and the defendant indicated his understanding. In the instant case, the court admonished the defendant that aggravated battery is a Class X felony punishable by imprisonment for 6 to 30 years, and the defendant indicated his understanding. The defendant also expressed his understanding that under the terms of the plea agreement, he would be sentenced to 20 years for the aggravated battery, and his sentence for count II in No. 14-CF-15 would be consecutive to that 20-year sentence. The court admonished the defendant, and he indicated his understanding, of the presumption of innocence, of his right to plead guilty or not guilty, of the State's burden of proving him guilty beyond a reasonable doubt, of his right to trial by a judge or a jury, of his right to be present, of his right to confront and cross-examine accusers, of his right against self-incrimination, of his right to testify if he so chose, of his right to call witnesses and to subpoena them if necessary, and of his right to a speedy trial. The court also admonished the defendant that by pleading guilty, he would not have a trial of any kind, he would waive his rights at trial, and he would be sentenced to prison in accordance with the plea agreement's terms.

¶ 7 The defendant pleaded guilty to aggravated battery, pleaded guilty to count II in No. 14-CF-15, and admitted the allegations in the petition to revoke probation in No. 10-CF-209. He also signed two written pleas of guilty and one written admission, and he indicated his understanding of each of the three documents. He also indicated that nobody had forced or threatened him, and nobody had promised him anything apart from what had been stated in court, to persuade him to sign each document, and that each signature was his free and voluntary act. The court found that his guilty pleas and his admission were knowingly and voluntarily made.

3

¶ 8    A factual basis in the instant case and in count II of No. 14-CF-15 was provided by the assistant state's attorney.  The court found factual bases for the guilty pleas and for the admission.  It imposed the agreed-upon sentences.  The court admonished the defendant as to his right to appeal, including the need for a motion to withdraw his guilty pleas, and the defendant indicated his understanding.

¶ 9    In July 2014, the defendant filed a *pro se* motion to withdraw guilty plea and vacate sentence, and a *pro se* motion to reduce sentence.  In the former motion, he alleged, *inter alia*, that he "was not in the right state of mind" at the time of his plea, in part due to drugs, and that plea counsel did not devote sufficient care or attention to his case.  The latter motion made similar allegations.  In September 2014, the state's attorney filed a motion to dismiss the defendant's *pro se* motion to withdraw guilty plea, and a motion to dismiss his *pro se* motion to reduce sentence, both on the ground of untimeliness.  In December 2014, the circuit court granted both of the State's motions to dismiss.  The defendant did not appeal from the judgment of conviction.

¶ 10    In April 2016, the defendant filed with the circuit court a *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)).  Essentially, he claimed that counsel Quinn had provided ineffective assistance.  More specifically, he claimed that (1) counsel had completely failed to discuss with him pretrial motions, information gleaned from discovery, tactics, or "an overall defense strategy," and while the defendant was in pretrial custody at the Marion County jail, counsel "spent a total of approximately three 10 minute sessions" with the defendant; (2) counsel had failed to conduct an adequate, independent pretrial investigation into the facts of the case, which should have included speaking with witnesses whom the defendant "identified as being favorable"; (3) counsel had failed to conduct pretrial interviews of "readily available witnesses" who had observed the defendant caring for children, and about whom the

4

defendant had "explicitly informed counsel during their 10 minute meeting"; and (4) counsel had threatened and coerced the defendant into pleading guilty, *e.g.*, by telling the defendant that he would receive "the max on every case" if he went to trial and lost, and that counsel did not have time for his case.

¶ 11    The defendant did not specify how the pretrial investigation should have been handled differently, or what sort of information may have been uncovered.  In his affidavit, the defendant named several witnesses who were familiar with his handling of children, but wrote that they were unavailable to him as of the date of the postconviction petition.

¶ 12    The court docketed the petition for further consideration, and appointed postconviction counsel for the defendant.  Eventually, attorney Brian C. Wernsman took over as the defendant's postconviction counsel.

¶ 13    On December 6, 2017, the defendant filed, through postconviction counsel Wernsman, an amended petition for postconviction relief.  The amended petition claimed that the defendant's plea of guilty "was not voluntarily or intelligently entered" because the defendant was inadequately advised of, and did not fully understand, the direct consequences of the plea, due to the ineffective assistance of plea counsel Quinn.  According to the defendant, plea counsel's performance fell below an objective standard of reasonableness, in that (1) counsel failed to adequately communicate with the defendant, or to adequately discuss pretrial motions, discovery, or defense strategy, or to raise the prospect of using an investigator to assist in the defense; (2) counsel failed to conduct an independent investigation of the facts of the case, failed to listen to the defendant's "side of the story," and failed to contact witnesses whom the defendant deemed favorable; and (3) counsel provided the defendant with misleading and confusing information about the plea offer and about what would happen if he did not accept it, and he coerced and threatened the defendant

5

into accepting the plea. The amended petition also incorporated the *pro se* petition. The defendant personally signed a notarized "certificate of veracity" wherein he swore that the allegations in the amended petition were "true and correct to the best of [his] information, understanding and belief."

¶ 14　Twelve sworn and notarized affidavits were attached to the amended petition, in support thereof. One of those affidavits was the defendant's. In it, the defendant described, *inter alia*, the case-related communications between himself and plea counsel Quinn prior to the guilty plea. According to the defendant, during the time that he was held in pretrial custody in the Marion County jail—between June 29, 2012, and July 27, 2012—Quinn "spent a total of approximately three 10 minute sessions consulting with [him] on this case." The defendant also stated that while he was "out on bond until the time of his plea, over 19 months (7/28/12-3/5/14), [he] had only 4 meetings with [plea] counsel." Also, the defendant described threatening, coercive, and dismissive behavior by Quinn that had led him to plead guilty, and he stated that Quinn had failed to inform him that a private investigator had been hired. As for the other 11 affidavits, almost all of which were from the defendant's relatives, they portrayed the defendant as a caring parent who would never harm a child. On that same day, Wernsman filed a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013).

¶ 15　In January 2019, the defendant, through postconviction counsel Wernsman, filed a memorandum of law in support of his postconviction petition. The State filed a response.

¶ 16　On January 16, 2019, the court held a hearing on the defendant's amended postconviction petition. The defendant, through Wernsman, merely asked the court to read the postconviction petitions and the sworn affidavits that had been filed with the amended petition. The defendant did not offer any other evidence; he neither testified nor called anyone else to testify. As for the State, it called, as its sole witness, the defendant's plea counsel, Steve W. Quinn.

¶ 17    Quinn, who was a long-time criminal defense attorney based in Marion County, testified that in October 2012, he was retained by the defendant's father, Jack Morton, to represent the defendant in the instant case, in which the defendant was charged with aggravated battery to his three-month-old son, and in No. 10-CF-209, wherein the State had filed a petition to revoke the defendant's probation in an unrelated case. Of the time spent on the defendant's criminal matters, most of it was devoted to the aggravated-battery case. According to Quinn, he knew from discovery in the case that the defendant was the only adult present at the time his infant son sustained injury. He also knew that the infant had been transferred to Cardinal Glennon Children's Hospital in St. Louis, where doctors diagnosed him with brain injuries and concluded that he was the victim of shaken baby syndrome. On his own, Quinn researched shaken baby syndrome.

¶ 18    Quinn testified that Jack Morton was more likely than the defendant to stop by his office to discuss the aggravated-battery case, though sometimes the defendant would join his father. Quinn met with the defendant "several" times before he pleaded guilty. He always scheduled an appointment when the defendant requested one. He never refused to speak with the defendant; he never threatened the defendant in any way; and he never demeaned the defendant's case or said that he did not have time for it. He never told the defendant that if he went to trial, he would lose and get the maximum sentence on everything, or that if he went to trial, he would automatically be sentenced to 58 years. However, Quinn felt "sure" that he told the defendant "what the maximum penalty could be" if he was convicted or pleaded guilty. Quinn and the defendant discussed the case and the State's evidence.

¶ 19    Quinn met with the defendant "[m]ore than once" regarding his version of events. Initially, the defendant stated that "the baby had slid in the baby tub, went under water, he hadn't noticed it right away," but when he did notice, he "grabbed the baby, got him back out of the water and

7

immediately went down to his father and mother's house and told them what had happened." According to Quinn, this version was consistent with what the defendant had told the police and medical personnel. Subsequently, though, the defendant gave Quinn another version of events. This time, the defendant said that the baby had bounced off a couch at his home, and had hit his head on the floor; afterwards, the child was limp, and it was then that the defendant took his baby to his parents' house. Acting on that information, Quinn hired a private investigator, Durbin Investigations, to photograph the couch and to measure the distance from the couch to the floor. He wanted to be able to show a jury how the infant may have been injured innocently. The defendant also suggested that Quinn speak with the infant's mother and some other potential witnesses. Quinn spoke with the infant's mother, but he did not speak with any of the defendant's other potential witnesses, for they were not "event witnesses." Instead, they were witnesses who could testify about the defendant's parenting in general. They could come in handy at a sentencing hearing, Quinn thought, but not at the defendant's trial. Quinn knew that he needed an expert witness, someone who could counter the anticipated testimony of the Cardinal Glennon doctors with an alternative, innocent explanation of how the infant was injured.

¶ 20    With the cooperation of the infant's mother, Quinn obtained all the medical records relating to the mother's pregnancy and the infant's birth, and all the infant's medical records since birth, including those relating to his injuries. The records filled a banker's box. Quinn looked them over as best he could. Then, he shipped all the records, plus the police reports and the private investigator's photos, to Dr. Marcus DeGraw, "a physician specializing in injuries to children," whom he had located in Detroit, Michigan. Quinn hoped the records would contain something useful to the defense. Dr. DeGraw reviewed everything that Quinn had sent him. Dr. DeGraw told Quinn that the infant's injuries were severe, and that symptoms would appear very quickly.

8

His conclusion was that the infant's injuries resulted from shaken baby syndrome; the injuries were consistent with shaking, not with falling from a couch to the floor. As Dr. DeGraw indicated to Quinn, his conclusions would be adverse to the defendant. Quinn shared this news with the defendant.

¶ 21    Quinn negotiated with the state's attorney's office. Originally, the State offered 25 years for aggravated battery in the instant case, 5 years in No. 10-CF-209, concurrent with the aggravated-battery sentence, and 10 years in No. 14-CF-15, consecutive to the aggravated-battery sentence. The sentences in the instant case and in No. 14-CF-15 were mandatory consecutive because the crime in No. 14-CF-15 was committed while the defendant was out on bond in the instant case. Quinn discussed the State's offer with the defendant. The two of them agreed that Quinn should make a counteroffer, under which the defendant would receive 20 years in the instant case, and 4 years in No. 14-CF-15. With the concurrent sentence of 5 years in No. 10-CF-209, the total aggregate sentence, pursuant to the counteroffer, would be 24 years. The State agreed to the counteroffer, and that became the agreement pursuant to which the defendant pleaded guilty.

¶ 22    After Quinn testified, the parties agreed to submit their arguments in writing. They did so.

¶ 23    On April 30, 2019, the circuit court entered an order denying the amended postconviction petition. The court found that plea counsel Quinn's performance, contrary to the defendant's claim, did not fall below an objective standard of reasonableness. The defendant filed a notice of appeal. The circuit court appointed OSAD as his attorney on appeal.

¶ 24                                ANALYSIS

¶ 25    This appeal is from the circuit court's denial of the defendant's amended petition for postconviction relief, following an evidentiary hearing. As previously noted, the defendant's appointed attorney on appeal, OSAD, has filed with this court a *Finley* motion to withdraw as

9

counsel, along with a supporting memorandum. OSAD suggests two potential issues for review, *viz.*: (1) whether the circuit court's denial of the amended postconviction petition was manifestly erroneous, and (2) whether postconviction counsel provided a reasonable level of assistance. In his written objection to OSAD's *Finley* motion, the defendant argues that postconviction counsel failed to provide reasonable assistance. This court finds OSAD's motion well taken, and the defendant's objection unavailing.

¶ 26    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides that a criminal defendant may challenge his conviction or sentence for substantial violations of federal or state constitutional rights. *Id.* § 122-1(a)(1); *People v. Edwards*, 2012 IL 111711, ¶ 21. A postconviction proceeding begins when the defendant files a verified petition in the circuit court. 725 ILCS 5/122-1(b) (West 2018). The Act provides for three stages of examination by the court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the third stage, an evidentiary hearing is held. 725 ILCS 5/122-6 (West 2018); *Domagala*, 2013 IL 113688, ¶ 34. At that hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). The court "may receive proof by affidavits, depositions, oral testimony, or other evidence" and it "may order the [defendant] brought before the court." 725 ILCS 5/122-6 (West 2018). The court typically acts as factfinder, determining the credibility of witnesses and the weight to be given particular testimony and evidence, and resolving any conflicts in the evidence. *Domagala*, 2013 IL 113688, ¶ 34. Relief is granted or denied based on that hearing. 725 ILCS 5/122-6 (West 2018). The denial of a postconviction petition after an evidentiary hearing is generally reviewed for manifest error. *People v. Coleman*, 2013 IL 113307, ¶ 98. Manifest error is that which is plain, clearly evident, and indisputable. *Id.*

10

¶ 27    In his petition, the defendant claimed that his plea counsel had provided ineffective assistance. When presented with an ineffective-assistance claim, this court applies the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). Under that test, a defendant must show both (1) that his attorney's performance fell below an objective standard of reasonableness, as measured by reference to prevailing professional norms, and (2) that the substandard representation so prejudiced the defendant that there is a reasonable probability that, absent the errors, the outcome would have been different. *Id.* at 687-88. A defendant must satisfy both prongs of *Strickland*; failure to satisfy either prong will preclude a finding of ineffective assistance. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010). Also, the defendant who claims ineffective assistance must overcome a "strong presumption" that counsel's performance falls within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. *Strickland* applies to claims arising out of the plea process. *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

¶ 28    The first potential issue raised by OSAD is whether the circuit court's denial of the amended postconviction petition was manifestly erroneous. It was not. This court will examine each of the amended petition's three allegations.

¶ 29    The defendant's first postconviction allegation was that plea counsel had failed to adequately discuss pretrial motions, discovery, or defense strategy, or to mention that he had hired a private investigator to assist in the defense. In his affidavit, the defendant attempted to support this allegation by stating that during the time he was in pretrial custody on the aggravated-battery charge—from June 29, 2012, to July 27, 2012—plea counsel "spent a total of approximately three 10 minute sessions consulting with [him] on this case," and also stating that during the 19-month period that he was out on bond on the charge—from July 28, 2012, to March 5, 2014—he had only

11

four meetings with plea counsel. As the circuit court observed in its order denying the postconviction petition, the crucial point in assessing the quality of a defendant-defense counsel relationship is not "the number of meetings" between the two, but rather "the information exchanged during the meetings." At the evidentiary hearing, plea counsel Quinn testified that on "several" occasions before the plea of guilty, he and the defendant discussed the case, the State's evidence in the case, and the defendant's version—or versions—of events. Quinn testified that he also discussed the case with the defendant's father (who generally seemed more curious about the case than the defendant himself), but whenever the defendant, who was out on bond for most of the relevant time period, requested an appointment with Quinn, an appointment was made. According to Quinn, he discussed with the defendant the State's plea offer and, with the defendant's approval, made a counteroffer to the State. It was this counteroffer that ultimately served as the basis of the parties' plea agreement. Also, defense counsel may not have mentioned that he had hired a private investigator, but an attorney is not obligated to mention each investigatory technique that he uses to obtain evidence. It is enough that he discusses all the pertinent evidence he has found, regardless of how he found it. There was no substantial showing of a constitutional violation in the first allegation.

¶ 30 The defendant's second postconviction allegation was that plea counsel had failed to investigate the facts of the case independently, had failed to listen to the defendant's "side of the story," and had failed to contact witnesses whom the defendant deemed favorable. Quinn made clear in his testimony at the evidentiary hearing that indeed he had conducted an independent investigation. He researched shaken baby syndrome, he hired a private investigator to take pictures and measurements at the defendant's home, he compiled all the medical records relating to T.M., and he located an expert, Dr. DeGraw, to examine all the evidence and give his professional

opinion as to the causes of T.M.'s brain injuries. Quinn listened to the defendant's versions of events, on more than one occasion. Indeed, it was in response to the defendant's second version of events that Quinn hired the private investigator. Also, Quinn acted properly in not contacting those witnesses whom the defendant deemed favorable. None of those witnesses was an occurrence witness; they could do nothing more than comment on the defendant's interactions with children generally. As Quinn correctly concluded, they were witnesses who could be useful at a sentencing hearing, but not at the defendant's trial for the aggravated battery of T.M. There was no substantial showing of a constitutional violation in the second allegation.

¶ 31 The defendant's third (and final) postconviction allegation was that plea counsel had provided the defendant with misleading and confusing information about the plea offer and about what would happen if he did not accept it, and he coerced and threatened the defendant into accepting the plea. Quinn's evidentiary-hearing testimony flatly contradicted this allegation, and the court was free to credit his testimony. Plus, at the guilty-plea hearing on March 5, 2014, the circuit court questioned the defendant about the knowing and voluntary nature of his pleas, and found that they were entirely knowing and voluntary, in accordance with Illinois Supreme Court Rule 402(b) (eff. July 1, 2012). The defendant did not make a substantial showing of a constitutional violation in the third allegation.

¶ 32 The second of the two potential issues raised by OSAD is whether the defendant's postconviction counsel provided a reasonable level of assistance. On the same day that postconviction counsel Wernsman filed the amended postconviction petition on the defendant's behalf, he also filed a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). Wernsman certified that he had consulted with the defendant in person and by telephone in order to ascertain his contentions of deprivation of constitutional rights in regard to his guilty

13

plea and sentence, that he had examined the trial court file and the official transcript of the proceeding held on March 5, 2014 (*i.e.*, the guilty-plea hearing), and that he had amended the *pro se* petition as necessary for an adequate presentation of the defendant's contentions. His certificate thus hit upon all three of the areas specified in Rule 651(c). The certificate and its filing created a presumption that Wernsman had provided a reasonable level of assistance to the defendant, and because nothing else in the record rebuts or contradicts that presumption, the certificate is facially valid. See *People v. Perkins*, 229 Ill. 2d 34, 52 (2007). Any argument that Wernsman had not provided reasonable assistance would lack merit.

¶ 33 In his written objection to OSAD's *Finley* motion, the defendant argues that postconviction counsel Wernsman failed to provide a reasonable level of assistance. More specifically, he argues that postconviction counsel (1) failed to cross-examine plea counsel Quinn at the evidentiary hearing in regard to (i) an invoice submitted by Dr. DeGraw to Quinn, and a letter written by Dr. DeGraw to Quinn, and (ii) an invoice submitted by the private investigator whom Quinn had hired, and photographs allegedly taken by the private investigator at the defendant's residence; (2) failed to examine the trial court record and Quinn's case file, and as a result failed to make necessary amendments to the defendant's *pro se* postconviction petition or made amendments that were unnecessary or incorrect; and (3) failed to make necessary changes in the amended postconviction petition and in the defendant's signed affidavit in support thereof, even after the defendant informed him that both documents contained "things" that were "wrong" and needed to be "changed." The defendant's objection—considered in conjunction with the *pro se* and amended petitions, and the transcript of the evidentiary hearing—does not show that Wernsman failed to provide a reasonable level of assistance. Nothing in it changes this court's conclusion that OSAD's motion is well taken.

14

¶ 34                             CONCLUSION

¶ 35    For the foregoing reasons, the circuit court did not err in denying the defendant's amended postconviction petition, and postconviction counsel provided the defendant with reasonable assistance. No contrary argument would have merit. Accordingly, OSAD's *Finley* motion to withdraw as counsel is hereby granted, and the judgment of the circuit court is hereby affirmed.

¶ 36    Motion granted; judgment affirmed.